Slip Op. 08-56

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

**E. I. DUPONT DE NEMOURS &<br>COMPANY**,

Plaintiff,

v.

**UNITED STATES**,

Defendant.

</td><td>

**Before: Timothy C. Stanceu, Judge**

**Court No. 02-00737**

</td></tr>
</table>

## <u>OPINION</u>

[Denying plaintiff's motion for summary judgment and granting defendant's cross-motion for summary judgment because Customs did not underpay manufacturing substitution drawback upon reliquidation of the entry]

Dated: May 27, 2008

*Crowell & Moring LLP* (*Barry E. Cohen*, *Amy B. Newman*, and *Alexander H. Schaefer*) for plaintiff.

*Gregory G. Katsas*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, *Barbara S. Williams*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Amy M. Rubin*); *Beth C. Brotman*, Office of Assistant Chief Counsel, International Trade Litigation, Customs and Border Protection, United States Department of Homeland Security, of counsel, for defendant.

Stanceu, Judge:  Plaintiff E. I. du Pont de Nemours & Company ("DuPont") moves for

summary judgment, contending that the U.S. Customs Service ("Customs") unlawfully denied

DuPont a portion of a refund ("drawback") of duties that DuPont had paid on imported

merchandise.[1]  DuPont brought this action to contest the denial by Customs of its protest of the

reliquidation of its entry seeking "manufacturing substitution drawback" under 19 U.S.C.

§ 1313(b) (Supp. V 1993).  The decision Customs made upon reliquidation had the effect of

limiting the duty refund to an amount that is approximately 55% of the amount of drawback

DuPont had claimed.  Defendant United States, in a cross-motion for summary judgment,

submits that the Customs determination upon reliquidation of the drawback entry was correct.

The court grants summary judgment in favor of defendant.

## I. BACKGROUND

The "manufacturing drawback" procedures of the customs laws of the United States

allow a refund, or "drawback," of 99% of the duties paid on imported merchandise, upon the

exportation of products ("articles") manufactured or produced in the United States with the use

of the imported merchandise.  *See* 19 U.S.C. § 1313(a).  This drawback, as authorized by

subsection (a) of 19 U.S.C. § 1313, is known as "manufacturing direct identification drawback."

Under subsection (b) of that section, an importer also may obtain drawback even if the specific

imported merchandise on which the claim for a duty refund is made was not used in

manufacturing the articles that were subsequently exported.  *See id.* at § 1313(b).  Under this

"manufacturing substitution drawback" procedure, other merchandise, whether imported or

domestic, may be substituted for the imported, duty-paid merchandise that is the subject of the

claim for drawback, provided the manufacturer or producer of articles uses the imported, duty-

---

[1] The Customs Service was renamed as "Bureau of Customs and Border Protection."  *See Reorganization Plan Modification for the Dep't of Homeland Security*, H.R. Doc. No. 108-32, at 4 (2003); *Homeland Security Act of 2002*, Pub. L. 107-296, § 1502, 116 Stat. 2135, 2308-09 (2002).

paid merchandise and the substituted merchandise in the manufacturing or production of "such articles" within three years of receipt of the imported, duty-paid merchandise, and provided the substituted merchandise is of the "same kind and quality" as the imported, duty-paid merchandise. *See id.* Where all requirements for manufacturing substitution drawback are satisfied, the statute provides for payment of "an amount of drawback equal to that which would have been allowable had the merchandise used therein been imported." *Id.*

The facts concerning DuPont's manufacturing process and its drawback entry that the court has found relevant to the disposition of this case and found to be uncontested, as discussed in this Opinion, are set forth in the various pleadings and exhibits thereto. *See* Compl. ¶¶ 4-13, Ex. A; Mem. in Supp. of Mot. for Summ. J. of Pl. E.I. DuPont de Nemours & Company ("Pl.'s Mem."), Ex. 2; Pl.'s Statement of Material Facts Not in Dispute ("Pl.'s Statement of Material Facts"); Def.'s Resp. to Pl.'s Statement of Material Facts as to which There Are No Genuine Issues to Be Tried ("Def.'s Statement of Material Facts"); Def.'s Statement of Additional Material Facts as to which There Are No Genuine Issues to Be Tried ("Def.'s Statement of Additional Material Facts"); Pl.'s Resp. to Def.'s Statement of Additional Material Facts as to which There Are No Genuine Issues to Be Tried ("Pl.'s Resp. to Def.'s Statement of Additional Material Facts").

A.  Manufacturing Process on which DuPont's Drawback Entry Was Based

DuPont sought drawback of duties it had paid on a quantity of "synthetic rutile," which is a processed ore that DuPont imported for the titanium contained within the ore. Compl. ¶ 6. Synthetic rutile is produced by subjecting ilmenite ore, a naturally-occurring ore containing crystalline titanium dioxide and oxides of iron, to processing that removes the iron oxide to

increase the concentration of titanium dioxide. *Id.* Ex. A ¶ 8. DuPont used the synthetic rutile in manufacturing its "Ti-Pure" brand pigments. The pigments contain titanium dioxide, which imparts opacity to paints and other coatings. *Id.* ¶ 5.

DuPont used four different imported and domestic raw materials, referred to as "feedstocks," to obtain the titanium it required for manufacturing the titanium dioxide used in its pigments. *Id.* ¶ 6. Only one of the four feedstocks DuPont used was synthetic rutile. *Id.* ¶ 6, Ex. A ¶ 8. DuPont also used as feedstocks ilmenite and rutile, which are naturally-occurring ores. *Id.* Rutile consists largely of crystalline titanium dioxide. The fourth feedstock DuPont used was titanium slag, which is a synthetic form of crystalline titanium dioxide produced by processing ilmenite to remove iron oxides. *Id.* None of these feedstocks consisted of or contained pure titanium metal; each contained titanium dioxide in varying proportions and also contained other substances that were separated out as waste during the titanium dioxide production process. *See id.* ¶¶ 6-7, Ex. A ¶ 8; Pl.'s Statement of Material Facts ¶¶ 2-4.

### B. Procedural History of DuPont's Drawback Entry

In the drawback entry at issue in this case (Entry No. G82-0000542-5), filed with Customs on December 6, 1991, DuPont based its claim for drawback on 6,961,934 pounds of Ti-Pure titanium dioxide pigment (identified by DuPont as "TiPure R-960") that had been exported during a period beginning in December 1988 and continuing through March 1989. Compl. ¶¶ 8-9, Ex. A-6. On the drawback entry form, DuPont designated for drawback 6,762,693 pounds of Australian-origin, duty-paid synthetic rutile that had been imported in April 1986 and used by DuPont in manufacturing during a period beginning in April 1986 and concluding in December 1987. *Id.* Ex. A-6. DuPont claimed drawback of $37,540 in duties paid

on imported synthetic rutile.  DuPont sought to use the substitution drawback procedure on the assertion that its feedstocks were of the "same kind and quality" as the designated imported synthetic rutile.  *Id.* ¶ 8.

Customs, upon liquidating Drawback Entry No. G82-0000542-5, denied all drawback on the ground that no drawback contract had been approved by Customs.  Compl. ¶¶ 9-10, Ex. A ¶ 13.  After Customs denied DuPont's protest of the liquidation on the ground that the designated synthetic rutile and the substituted feedstocks were not of the same kind and quality and on additional grounds, DuPont contested the protest denial in the Court of International Trade.  Compl. ¶ 10-11, Ex. A.  In *E.I. DuPont de Nemours & Co. v. United States*, 24 CIT 1045, 116 F. Supp. 2d 1343 (2000) (*"DuPont I"*), the Court of International Trade held that DuPont was entitled to manufacturing substitution drawback.  The Court of International Trade therefore granted DuPont's motion for summary judgment and ordered Customs to approve DuPont's proposed drawback contract, to reliquidate the drawback entry, and to "pay DuPont's drawback claim in accordance with this decision."  *DuPont I*, 24 CIT at 1051, 116 F. Supp. 2d at 1350.

Upon reliquidating the drawback entry on July 13, 2001, Customs paid DuPont drawback in the amount of $20,839.63.  Compl. ¶ 12, Ex. D.  Upon DuPont's protest of the reliquidation, Customs headquarters issued a ruling ordering the Director of the Port of Elizabeth, New Jersey to deny the protest.  HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373; Compl. Ex. E (setting forth the protest denial and HQ 229433, the headquarters ruling that accompanied the denial); Def.'s Mem. Ex. A (also setting forth HQ 229433).  In the ruling, Customs reached three determinations, the combined effect of which limited DuPont's drawback to approximately 55% of the amount DuPont had claimed.  First, Customs determined that the imported synthetic rutile

and the feedstocks substituted for it were not of the "same kind and quality" for purposes of manufacturing substitution drawback. HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at \*1-\*2. Second, Customs regarded the element titanium, which was obtained from the imported synthetic rutile and the other feedstocks, as the only "merchandise" that was "of the same kind and quality" for which the drawback law permitted substitution. *Id.* at \*2-\*3. Third, Customs limited DuPont's drawback based on what it calculated to be the duty paid on the titanium content of the quantity of imported synthetic rutile for which DuPont substituted the various feedstocks that appeared, in the form of titanium, in the exported TiPure pigment, instead of the entire duty that DuPont paid on that quantity of imported synthetic rutile. *Id.* at \*3-\*4. To make this calculation, Customs divided the atomic weight of titanium by the molecular weight of titanium dioxide and multiplied that percentage, .5993, by the percentage by weight of synthetic rutile that consists of titanium dioxide, .917. *Id.* at \*5. The product of the two percentages was approximately 55%; on this basis, Customs determined that DuPont's drawback should be limited to approximately 55% of the drawback claimed. *See id.*; Pl.'s Mem. 7. In effect, Customs allocated the remaining 45% of the claimed drawback to the non-titanium content of the imported synthetic rutile, which DuPont describes as valueless waste and which appeared neither in the TiPure pigment nor in any other product of DuPont's manufacturing operation. *See* Pl.'s Mem. 12-13; Pl.'s Supplemental Mem. in Supp. of Mot. for Summ. J. 2-9 ("Pl.'s Supplemental Mem.").

The protest denial that plaintiff contests in this case occurred on June 14, 2002. Compl. Ex. E. The following month, Customs issued an interim rule amending its procedures governing manufacturing substitution drawback ("Interim Rule"). *See Manufacturing Substitution*

*Drawback: Duty Apportionment*, 67 Fed. Reg. 48,368 (July 24, 2002) (*"Interim Rule"*).  The

Interim Rule, in 19 C.F.R. § 191.26(b)(4)(i), required that "[t]he duty paid on the imported

material must be apportioned among its constituent components," *id.* at 48,370, and that the

"claim on the chemical element that is the designated merchandise must be limited to the duty

apportioned to that chemical element on a unit-for-unit attribution . . . ."  *Id.* at 48,369.  Customs

stated that its reason for issuing the Interim Rule was to bring the rules governing manufacturing

substitution drawback into accordance with the decision of the United States Court of Appeals

for the Federal Circuit ("Court of Appeals") in *International Light Metals, A Division of Martin*

*Marietta Technologies, Inc. v. United States,* 194 F.3d 1355 (1999) (*"International Light*

*Metals"*), and *DuPont I.  Id.* at 48,369.  The Interim Rule, amending the part of the regulations

governing recordkeeping for drawback, was made to apply "[i]f the designated merchandise is a

chemical element that was contained in imported material that was subject to an *ad valorem* rate

of duty, and a substitition drawback claim is made based on that chemical element."  *Id.*

at 48,370 (codified at 19 C.F.R. § 191.26(b)(4) (2003)).  Plaintiff filed its summons on

November 8, 2002 and its complaint on November 22, 2002.

On August 22, 2003, following a period for public comment, Customs adopted the

Interim Rule as a final rule ("Final Rule") without substantive change.  *See Manufacturing*

*Substitution Drawback: Duty Apportionment*, 68 Fed. Reg. 50,700 (Aug. 22, 2003) ("*Final*

*Rule*").  In response to comments urging apportionment by value instead of weight, Customs

stated that "the courts in both [*International Light Metals*] and *DuPont [I]* require apportionment

by relative weight."  *Id.* at 50,701.  As did the Interim Rule, the Final Rule contained a single

example to illustrate the new requirement of apportionment by relative weight.  That example

was based principally on the facts of DuPont's drawback entry. *See id.* at 50,703; *Interim Rule*, 67 Fed. Reg. at 48,370.

C.  Voluntary Dismissal of Plaintiff's Claim Pertaining to the Judgment in *DuPont I*

As originally filed, the complaint in this case included a claim ("Count I") stating as follows: "This Court's ruling in *Dupont I* directed Customs to pay the full amount of the drawback claim in Entry No. G82-0000542-5. Customs' failure to do so is contrary to law." Compl. ¶ 14. With the consent of the parties, the court entered an order on March 3, 2006 designating Count I as a separate case (Court No. 06-00055). The new case was dismissed on May 16, 2006 after both parties voluntarily stipulated for dismissal pursuant to USCIT Rule 41(a)(1)(B).

## II.  DISCUSSION

This court exercises jurisdiction under 28 U.S.C. § 1581(a) (2000). Summary judgment is awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." USCIT R. 56(c).

DuPont's first argument is that the Court of International Trade in *DuPont I* ordered Customs to pay DuPont's drawback claim and did not authorize Customs to develop new reasons not to do so. Pl.'s Mem. 9. "Well-established principles of *res judicata* prevent Customs from refusing to reliquidate and pay in full the drawback claim that was before the Court in *DuPont I*." *Id.* According to plaintiff, "Customs' refusal to reliquidate the entry at the requested amount is nothing more than an attempt to relitigate the claim presented in *DuPont I* by asserting a defense that it could have raised and litigated there." *Id.* at 10. Second, in the alternative, DuPont argues

that the drawback statute does not permit Customs to reduce the amount of its drawback claim by

"apportioning" the refund of duties paid on synthetic rutile between the titanium content of the

synthetic rutile and the non-titanium content. *Id.* at 11-19. In support of this argument, DuPont

submits that the imported synthetic rutile and the substituted feedstocks are the merchandise that

is of the "same kind and quality" for purposes of the manufacturing substitution drawback

provision in the statute. *Id.* at 13-15. Plaintiff's third argument is that if apportionment is

authorized by the drawback law, then such apportionment must be based on relative value rather

than on relative weight. *Id.* at 19-23.

Defendant counters that if *res judicata* applies, it applies in favor of its own position

because of certain language in the *DuPont I* opinion that defendant interprets as requiring

apportionment of DuPont's drawback by weight. Def.'s Mem. in Supp. of its Cross-Mot. for

Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. 14-16 ("Def.'s Mem."). Defendant's second

argument is that the reliquidation of the drawback entry was in accord with the aforementioned

Customs regulation requiring, in certain circumstances, duty apportionment by relative weight.

*Id.* at 10-11. Defendant maintains that this court must accord deference to the construction of the

drawback statute underlying the regulation, even though the regulation was promulgated after

Customs denied the protest leading to this action. *Id.* at 12-13. Defendant submits that the

merchandise of the "same kind and quality" for purposes of the manufacturing substitution

drawback provision is confined to the element titanium. *Id.* at 14. Additionally, defendant

argues that "when drawback is claimed on an 'appearing-in' basis as it is here, drawback can

only be paid on the portion of the merchandise actually appearing in the exported product." *Id.*

at 18. Defendant argues, further, that because the statute is silent as to the method of

apportionment between waste and the sought element, Customs' interpretation of the statute, under which the apportionment is made based on relative weight and not on relative value, should be upheld. *Id.* at 24-25. Defendant views the decision by Customs to apportion based on weight, and not value, as "reasonable and administratively reliable." *Id.* at 25. Defendant further argues that "even without deference, the method by which Customs calculated the amount payable on DuPont's drawback claim is consistent with prior judicial precedent, with prior Customs precedent, and with applicable statutory and regulatory provisions." *Id.* at 8.

Below, in part A, the court discusses the uncontested facts, concluding that there is no genuine issue as to any fact material to the calculation of the amount of drawback owed to DuPont. The court, in part B, then considers the effect of the *res judicata* principle of claim preclusion on the counts that remain in this litigation following the severance of the first count in the complaint. The court concludes, contrary to plaintiff's argument, that the principle of *res judicata* does not extinguish the government's defense to DuPont's claim that DuPont is entitled to drawback in the full amount. Next, in part C, the court discusses the reasons for its conclusions that *DuPont I* did not decide the amount of drawback that DuPont is to be paid on its drawback entry but did decide that the designated synthetic rutile and the substituted feedstocks are of the same kind and quality, an issue that defendant may not relitigate here because of the effect of the principle of issue preclusion. In part D, the court concludes that Customs erred in basing its "apportionment" on its "same kind and quality" finding and that the statute, in the manufacturing substitution drawback provision, does not limit DuPont's drawback according to the proportion of titanium in the synthetic rutile. The court, in part E, rejects defendant's deference argument pertaining to the Final Rule. In part F, in response to defendant's argument

that HQ 229433 deserves deference, the court concludes that HQ 229433 is based on flawed

reasoning.  The court in part G explains that it is the approved drawback contract and the

regulations governing the contract that limit the available drawback.  Specifically, the drawback

contract confines claims to the appearing-in basis, effectively precluding claims on the used-in

basis, and thereby limits the available drawback according to the quantity, by weight, of the

designated merchandise or substituted merchandise that appears in the exported TiPure.  The

court, therefore, denies DuPont's motion for summary judgment.  Finally, in part H, the court

concludes that in paying drawback of $20,839.63 on Entry No. G82-0000542-5, Customs paid

DuPont drawback in an amount slightly higher than that actually owed and, for this reason, grants

defendant's cross-motion for summary judgment.

### A.  The Parties Agree on the Facts Material to the Calculation of the Amount of DuPont's Drawback but Do Not Agree on the Calculation Method

In its complaint in this case, DuPont sought payment of drawback on Entry No.

G82-0000542-5 in the amount of $37,547.[2]  Compl. ¶ 9.  However, DuPont has acknowledged

that "[b]ecause of an apparent arithmetic error, the correct amount of the drawback claim should

have been $37,510" and now seeks summary judgment in that amount.  Pl.'s Mem. 6 n.4.  It

appears that the error affecting the drawback claim stemmed from a miscalculation of the

titanium equivalent of the total imported synthetic rutile and that a similar error affected the

reliquidation of the drawback entry.  In view of these errors, and to provide context for the legal

issues to be decided herein, the court will discuss in detail the undisputed facts upon which it

concludes that an award of summary judgment to defendant is the correct disposition of this case.

---

[2] The actual amount of the drawback claim appears to be $37,540, as shown on the drawback entry.  Compl. Ex. A-6 at 1.

### 1. Undisputed Facts Material to the Calculation of Drawback under Either the Method Advocated by Plaintiff or That Advocated by Defendant

The court notes the following uncontested facts, as stated in the various pleadings, exhibits thereto, the parties' statements as to material facts filed pursuant to USCIT Rule 56(h), and other submissions in this case. *See* Compl. ¶¶ 4-13, Ex. A; Pl.'s Mem. 5-7, Ex. 2; Def.'s Mem. & Ex. A; Pl.'s Statement of Material Facts; Def.'s Statement of Material Facts; Def.'s Statement of Additional Material Facts; Pl.'s Resp. to Def.'s Statement of Additional Material Facts. DuPont's drawback claim arose from exports of 6,961,934 pounds of TiPure pigments. Compl. ¶ 9, Ex. A-6 at 1; HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *5. According to the drawback entry, the titanium dioxide content of the TiPure pigments was 89%; the exports therefore contained 6,196,121 pounds of titanium dioxide. *See* Compl. Exs. A-6 at 1 & E; Def.'s Mem. Ex. A; HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *5. Because, as the parties agree, the titanium element comprises by atomic weight 59.93% of the molecular weight of the compound titanium dioxide, DuPont's exported TiPure pigments were the equivalent of 3,713,335 pounds of titanium. *See* Compl. ¶ 9; Def.'s Mem. 4-5, Ex. A; Def.'s Statement of Additional Material Facts ¶ 3; HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *5.

The parties also agree that DuPont paid $63,077 in duties on 11,248,972 pounds of imported synthetic rutile, the quantity imported on the single consumption entry on which the duty was paid. Compl. ¶ 9, Exs. A-6 at 1 & C; Def.'s Mem. Ex. A; HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *5. The 11,248,972 pound quantity contained 10,315,307 pounds of titanium dioxide, based on a 91.7% titanium dioxide content in synthetic rutile.

Compl. Exs. A-6 at 1 & C; Def.'s Mem. Ex. A; HQ 229433 (May 10, 2002), *available at*

2002 WL 1584373 at *5. Applying the 59.93% factor to determine the amount of titanium

corresponding to the titanium dioxide yields a titanium equivalent of 6,181,963 pounds in the

11,248,972 pounds of imported synthetic rutile.[3] Compl. Exs. A-6 at 1 & C; Def.'s Mem. 4-5,

Ex. A; HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *5.

Of the 11,248,972 pounds of imported synthetic rutile, DuPont designated 6,762,693

pounds of synthetic rutile for drawback, an amount shown on the drawback entry (Customs

Form 331). *See* Compl. ¶ 9, Ex. A-6 at 1; Def.'s Mem. Ex. A; HQ 229433 (May 10, 2002),

*available at* 2002 WL 1584373 at *5. Applying the same factors, *i.e.*, 91.7% titanium dioxide

content in synthetic rutile and 59.93% titanium equivalent in titanium dioxide, produces a

titanium equivalent of 3,716,493 pounds in the amount of imported synthetic rutile that DuPont

designated for drawback.[4] *See* Compl. ¶ 9, Exs. A-6 at 1 & C; Def.'s Mem. 4-5, Ex. A;

HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *5.

---

[3] DuPont calculated its drawback claim using the amount of 6,176,709 pounds of titanium equivalent in the total imported synthetic rutile and used that amount in presenting its protest claim. *See* Compl. Ex. D at 2; HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *5. The correct determination of titanium equivalent for the 11,248,972 pounds of imported synthetic rutile is 6,181,963 pounds. *See* Mem. in Supp. of Mot. for Summ. J. of Pl. E.I. DuPont de Nemours & Company 6 n.4 ("Pl.'s Mem."); HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *5.

[4] The drawback entry (Customs Form 331) erroneously indicated that the titanium equivalent of the designated synthetic rutile was 5,357,165 pounds. *See* Compl. Ex. A-6 at 1. The uncontested facts cause the court to conclude that DuPont did not use this erroneous quantity in determining the amount of its drawback claim and that Customs, although identifying the error at or around the time of reliquidation, did not use the erroneous quantity in reliquidating the drawback entry. *See* HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *5; Compl. Ex. E (setting forth the protest denial and HQ 229433, the headquarters ruling that accompanied the denial); Def.'s Mem. in Supp. of its Cross-Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Mem.") Ex. A (also setting forth HQ 229433).

DuPont's manufacturing of the exported TiPure resulted in waste products due to impurities present in the various feedstocks, including iron chloride; it is uncontested that DuPont, in some instances, disposed of these waste products but in other instances sold them to other parties. *See* Pl.'s Mem. Ex. 2 ¶ 6 (setting forth the declaration of Norman Shurak, dated August 19, 2003) ("Norman Shurak Decl."); Compl. Ex. A-4 (setting forth the drawback contract and the proposed revisions that the Court of International Trade ordered approved in *DuPont I*, 24 CIT at 1051, 116 F. Supp. 2d at 1350) ("*Approved Drawback Contract*"). In support of its motion for summary judgment, DuPont has not submitted as an uncontested fact the amount it received for the sale of this waste.

2.  The Motion and Cross-Motion for Summary Judgment Differ on the Method By Which Drawback Is Calculated Using the Same Set of Material Facts

Under the method of calculating drawback advocated by DuPont, 60.067% of the total import shipment of synthetic rutile is considered to have been used to produce the quantity of TiPure pigment exported based on the stoichiometric substitution of titanium, *i.e.*, substitution on a pound-for-pound basis. Pl.'s Mem. 6-7. The .60067 percentage is obtained by dividing the titanium equivalent of the exported TiPure pigment (as noted above, 3,713,335 pounds) by the titanium equivalent of the total import shipment of synthetic rutile (as corrected, 6,181,963 pounds). *Id.* at 6. DuPont argues that the drawback is then calculated by applying the .60067 percentage to the duty paid on the synthetic rutile, which was $63,077; the result, reduced by the 1% drawback fee, is $37,510.[5] *Id.*

---

[5] The 1% reduction is required by the drawback statute. 19 U.S.C. § 1313(a) (Supp. V 1993) ("less 1 per centum of such duties"); *id.* § 1313(b) ( . . . the total amount of drawback allowed . . . shall not exceed 99 per centum of the duty paid on such imported merchandise.").

The agreement between the parties on the material facts is confirmed by use of those same facts by Customs in the headquarters decision which defendant maintains is correct. *See* HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373; Def.'s Mem. 1-5. In HQ 229433, the Customs ruling directing the Customs officials at the Port of Elizabeth, New Jersey to deny the protest of the reliquidated drawback entry, Customs recalculated DuPont's drawback claim according to its own method but also, in footnotes, presented a recalculation of the drawback according to the method DuPont advocated in the protest and advocates in this litigation. *See* HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *6, nn.1-5. The result of the Customs calculation using DuPont's method was $37,888. *Id.* at *6 n.3. Reduced by the 1% fee, this calculation yields a result in agreement with DuPont's current position that the correct calculation of its drawback claim is $37,510.[6] *See* Pl.'s Mem. 6 n.4.

The method the United States advocates is also based on the stoichiometric substitution of titanium on a pound-for-pound basis but would allow drawback of only 54.9558% of the $37,510 amount of drawback that DuPont now claims. *See* HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *6, nn.4-5 (calculating the amount of $20,822 without the 1% reduction, which reduction would further reduce the drawback amount to $20,614). Customs obtained the .549558 percentage by multiplying the percentage of the weight of the imported synthetic rutile that is comprised of titanium dioxide, *i.e.*, 91.7%, by the percentage of the

---

[6] HQ 229433 states that "[u]sing the corrected amount of titanium in the imported rutile, 6,181,963 [pounds], and based on DuPont's formula, though incorrect, the amount of drawback claimed would have been $37,888 (3,713,335 / 6,181,963 X $63,077)." HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *6 n.3. Absent rounding in the last step of the calculation, the drawback claim would be $37,888.61, 99% of which is $37,509.72, which agrees with DuPont's position that the corrected calculation of its drawback is $37,510.

molecular weight of the titanium dioxide molecule that is represented by the atomic weight of the

titanium atoms within that molecule, *i.e.*, 59.93%. *Id.* at *6, nn.1, 4-5. The result of the

calculation, $20,822, represents the amount of duty that Customs considers DuPont to have paid

on the titanium contained within the quantity of imported synthetic rutile that corresponded, for

substitution drawback purposes, to the titanium appearing in the exported TiPure pigments.[7] *Id.*

at *6, n.5.

Customs allowed $20,839.63 in drawback upon the reliquidation of the drawback entry at

issue. *Id.* at *2. Defendant's cross-motion for summary judgment seeks dismissal of the case,

such that the drawback as determined upon that reliquidation, although slightly higher than

defendant considers to be correct, would be allowed to stand. *See* Def.'s Mem. 26. In response

to the protest of the reliquidation, Customs recalculated the drawback, concluding that the

$20,839.63 amount was erroneous and that the correct amount of drawback should have been

$20,822. HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *2, *5. The error,

identified in HQ 229433, was in the determination of the titanium equivalent of the total amount

of the imported synthetic rutile. *Id.* at *5. In reliquidating the entry, Customs used the quantity

of 6,176,709 pounds of titanium equivalent instead of the correct titanium equivalent of

---

[7] To perform this calculation, Customs in HQ 229433 "apportioned" DuPont's drawback by multiplying $63,077, the duty paid on total quantity of synthetic rutile imported, by the calculated 54.9558%, resulting in $34,664. This amount, representing what Customs considered DuPont to have paid for the titanium content of the entire shipment of synthetic rutile, is then multiplied by the ratio of 3,713,335, the pounds of titanium equivalent exported, to 6,181,963, the pounds of titanium equivalent on which the total duty was paid. The result is $20,822. It appears that the calculation as set forth in HQ 229433 did not include a final step to deduct the 1% fee. *See* HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *6 nn.4-5.

6,181,963 pounds, an error HQ 229433 attributed to the calculation DuPont used to prepare the drawback entry. *Id.*

### B.  Because DuPont Is Suing on a New Cause of Action, the *Res Judicata* Principle of Claim Preclusion Does Not Foreclose the Government's Defense

DuPont's first argument in support of its motion for summary judgment is that "[w]ell-established principles of *res judicata* prevent Customs from refusing to reliquidate and pay in full the drawback claim that was before the Court in *DuPont I*." Pl.'s Mem. 9.  Specifically, plaintiff relies on the *res judicata* principle of claim preclusion, arguing that "[u]nder the doctrine of *res judicata*, or claim preclusion, a 'judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action.'" *Id.* (internal citations omitted).  Plaintiff's argument essentially is that *DuPont I*, by operation of the *res judicata* principle of claim preclusion, forecloses the government's defense that DuPont is not entitled to the full amount of drawback it is seeking. *Id.* at 10.  Defendant argues that *DuPont I* actually considered this defense when it considered the issue of apportionment and that *DuPont I* decided the apportionment issue in defendant's favor.  Def.'s Mem. 15-16.

"Under res judicata, 'a final judgment on the merits bars further claims by parties or their privies based on the same cause of action.'" *Brown v. Felsen*, 442 U.S. 127, 131 (1979) (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)).  Claim preclusion forecloses relitigation of claims that actually were raised or that could have been raised:

> The general rule of *res judicata* applies to repetitious suits involving the same cause of action. . . .  The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."

*Comm'r v. Sunnen*, 333 U.S. 591, 597 (1948) (quoting *Cromwell v. County of Sac*, 94 U.S. 351, 352 (1876)).

Because *DuPont I* has culminated in a final judgment, the cause of action on which DuPont sued the United States in that case has been merged into the judgment in *DuPont I* and may not be the subject of a second suit by DuPont against the United States on that same cause of action. *See* Restatement (Second) of Judgments § 18 (1982) (setting forth "Judgment for Plaintiff–The General Rule of Merger" and stating that "[w]hen a valid and final personal judgment is rendered in favor of the plaintiff: (1) The plaintiff cannot thereafter maintain an action on the original claim or any part thereof, although he may be able to maintain an action upon the judgment; and (2) In an action upon the judgment, the defendant cannot avail himself of defenses he might have interposed, or did interpose, in the first action."). DuPont could obtain a remedy on its previous cause of action only by suing on the judgment entered in *DuPont I*. *See id.* As originally filed, plaintiff's complaint included Count I, which asserted that "[t]his Court's ruling in *DuPont I* directed Customs to pay the full amount of the drawback claim in Entry No. G82-0000542-5. Customs' failure to do so is contrary to law." Compl. ¶ 14. Count I reasonably could be construed as seeking enforcement of the judgment in *DuPont I*. With the consent of the parties, the court severed this count from the other two counts in the complaint and designated it as a separate case. That case subsequently was dismissed by stipulation of the parties under USCIT Rule 41(a)(1)(B).

Claim preclusion does not occur where the parties are identical but the cause of action in the second suit is not the same as that involved in the first suit. Therefore, to resolve the competing *res judicata* arguments the parties have presented, the court first must determine

whether DuPont, in bringing its action against the United States according to the remaining counts in its complaint, is now suing on the same cause of action on which it sued the United States in *DuPont I*. The court concludes that because the instant matter arises out of a different group of transactional facts than those on which DuPont sued in *DuPont I*, this case must be considered to bring a new cause of action.

Count II of the complaint alleges that in reliquidating the drawback entry, Customs acted inconsistently with the drawback statute in apportioning the duties DuPont paid on the designated portion of the imported synthetic rutile and thus reducing DuPont's drawback. Compl. ¶¶ 15-16. Count III alleges that if any apportionment was lawful, it was required by the drawback statute to be accomplished according to relative value, and not according to relative weight as Customs did in reliquidating the drawback entry. *Id.* ¶¶ 17-18. Counts II and III (*i.e.*, the remaining counts) in the complaint contest the administrative decision that Customs made in denying the protest DuPont filed in response to the reliquidation of its drawback entry. That administrative decision, and events surrounding it, are essential to plaintiff's invoking the court's jurisdiction. These events followed the decision in *DuPont I* and the reliquidation of the drawback entry by Customs in response to the judgment entered in that case and include DuPont's protest of the reliquidation, issuance by Customs headquarters of HQ 229433 (which directed the Port of Elizabeth to deny the protest and explained the reasons for the headquarters decision), and a denial of the protest by the Port Director for Elizabeth in accordance with HQ 229433. *See* Compl. Exs. B-E. Thus, *DuPont I*, although involving the same drawback entry as this case, arose from a judicial challenge to a different administrative determination by Customs, *i.e.*, the denial of the protest DuPont filed to contest the *original* liquidation of the

drawback entry at zero drawback. The group of transactional facts on which this case was brought differ in these respects from the facts that gave rise to *DuPont I*.

Where the transactional or operative facts in two cases differ as they do here, the causes of action in those two cases are not the same. *See Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1362-64 (Fed. Cir. 2000) (concluding that the same cause of action can exist in two cases only where the same set of transactional facts are involved in those cases and that, where the transactional facts differ, the doctrine of claim preclusion does not apply); *Young Eng'rs Inc. v. Int'l Trade Comm.*, 721 F.2d 1305, 1314 (Fed. Cir. 1983) (stating that claim preclusion prevents the "assertion of the same transactional facts in the form of a different cause of action or theory of relief."); *Black's Law Dictionary* 235 (8th ed. 2004) (stating that a "cause of action" is "1. [a] group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person; CLAIM . . . ."). In raising its defense in this case, the government is not collaterally attacking the judgment entered in *DuPont I*. *Cf. Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1324 (Fed. Cir. 2008) (citing Restatement (Second) of Judgments § 18(2) (1982) and noting that a defense that could have been interposed in the first action cannot later be used to collaterally attack the judgment resulting from the first action). In summary, because the two remaining counts in DuPont's complaint involve a different cause of action from that upon which DuPont sued in *DuPont I*, the *res judicata* doctrine of claim preclusion does not foreclose the government's defense that Customs acted lawfully in limiting DuPont's drawback payment as it did.

C.  Issue Preclusion: *DuPont I* Did Not Decide the Amount of Drawback that DuPont Should Be Paid on its Drawback Claim But Decided the Issue of "Same Kind and Quality"

Where the parties are the same but the cause of action is not the same as that asserted in the original suit between those parties, the principle of "issue preclusion," also referred to as "collateral estoppel," applies to foreclose relitigation of issues actually litigated and decided in the prior case.

> Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time.  But matters which were actually litigated and determined in the first proceeding cannot later be relitigated.

*Comm'r v. Sunnen*, 333 U.S. at 598.  The doctrine of issue preclusion applies to disallow relitigation of issues of law and issues of fact.  As the Supreme Court has explained, "[u]nder collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citing *Montana*, 440 U.S. at 153).  The principle of issue preclusion requires that the court determine which, if any, of the issues decided in *DuPont I* are also issues raised by this case.

1.  *DuPont I* Did Not Decide the Amount of Drawback that DuPont Should Be Paid on its Drawback Claim

According to plaintiff's arguments, among the issues decided in *DuPont I* was the amount of drawback that DuPont was to be paid.  Plaintiff points out that its complaint in *DuPont I* specified the exact amount of money it sought on its drawback entry.[8]  Pl.'s Mem. 9.  DuPont

---

[8] Paragraph 13 of the complaint in *E.I. DuPont de Nemours & Co. v. United States*, 24 CIT 1045, 116 F. Supp. 2d 1343 (2000) (*"DuPont I"*) stated that "DuPont claimed a duty

(continued...)

argues that *DuPont I* "remanded to Customs the same drawback entry that is the subject of this litigation, with the instruction that the agency 'approve the proposed drawback contract . . . , reliquidate the drawback entry, and pay DuPont's drawback claim in accordance with this decision.'" *Id.* at 9 (quoting *DuPont I*, 24 CIT at 1051, 116 F. Supp. 2d at 1350). Defendant disagrees with DuPont's analysis of *DuPont I*, arguing essentially that if issue preclusion applies, it applies in favor of the position of the United States. Def.'s Mem. 14-16. According to defendant's argument, *DuPont I* decided that DuPont's drawback must be limited by apportioning the duty paid between the titanium content of the synthetic rutile and the other elements contained in the synthetic rutile. *Id.* at 16.

Each of the parties supports its argument for summary judgment by citing passages from the *DuPont I* opinion. However, the court concludes from that opinion that the holding of *DuPont I* is narrower than that presumed by the arguments of either party. *DuPont I* settled in the affirmative the question of whether substitution drawback was available on Entry No. G82-0000542-5. *DuPont I* did not decide the issue of the actual amount of drawback that DuPont was owed and did not decide the method by which the drawback must be calculated. Instead, *DuPont I* left the calculation of the amount of drawback to be determined by Customs upon the reliquidation of the drawback entry.

Although the *DuPont I* opinion mentions the amount of the drawback claim, $37,540, it does so only in presenting the background of the case. *See DuPont I*, 24 CIT at 1046, 116 F. Supp. 2d at 1345. The holding in *DuPont I* is not directed to the specific issue of how DuPont's

---

[8](...continued)
drawback of $37,540.00 in respect of exports of 6,961,934 pounds of 'Ti-Pure' brand titanium dioxide." Compl. Ex. A ¶ 13; Pl.'s Mem. Ex. 3 ¶ 13.

drawback is to be calculated. Instead, the opinion introduces the issue to be decided as follows:

"At issue is DuPont's entitlement under 19 U.S.C. § 1313(b) to a drawback upon exportation

from December 1988 through March 1989 of 60 shipments of 'Ti-Pure R-960' titanium dioxide

pigment manufactured in the United States." *Id.* at 1045, 116 F. Supp. 2d at 1344-45. The text

of the opinion that follows is directed almost entirely to the issue of whether, under the factors

discussed in *International Light Metals*, the "same kind and quality" requirement of 19 U.S.C.

§ 1313(b) precludes drawback because of the physical differences between synthetic rutile and

the three other products used as feedstocks and because of the resulting differences in the

manufacturing process. *Id.* at 1048-51, 116 F. Supp. 2d at 1347-50.

The sole passage in the *DuPont I* opinion that mentions the method of calculating

drawback lends further support to the conclusion that *DuPont I* refrained from deciding the

amount of drawback, intending instead that Customs was to calculate the drawback upon

reliquidating the drawback entry. The passage reads as follows:

> The Government, as something of an afterthought, asserts that a ruling in favor of
> DuPont would place an undue burden on Customs because of the difficulty
> involved in *calculating the proper amount of DuPont's drawback.* According to
> the Government, the rate of duty on the imported merchandise for which
> drawback is claimed (synthetic rutile) was an *ad valorem* rate on the value of the
> ore, rather than on the value of the titanium content. The Government argues that
> any drawback would entail the difficult task of apportioning the duty paid between
> the synthetic rutile's titanium content and the other elements contained therein.
> *However, since the uncontroverted Manufacturing Drawback Certificate* [(the
> drawback entry form)] *contains the necessary percentages for making the
> calculation, this burden would not seem to be a sufficient reason for denying
> DuPont its relief.*

*Id.* at 1049-50, 116 F. Supp. 2d at 1348-49 (emphasis added and internal citations omitted). If, as

plaintiff argues, the Court of International Trade in *DuPont I* had intended to direct Customs to

pay DuPont $37,540, then the above-quoted passage would not have mentioned "the necessary percentages for making the calculation" in response to the government's claimed "difficulty involved in calculating the proper amount of DuPont's drawback." *Id.* at 1050, 116 F. Supp. 2d at 1348-49. Were DuPont correct in its interpretation of the holding in *DuPont I*, the calculation of "the proper amount of DuPont's drawback" already would have been made and decided by the Court of International Trade as part of the holding in the case. The above-quoted passage is inconsistent with any such interpretation of that holding, which must be ascertained from the *DuPont I* opinion as a whole. The court concludes from this passage, and from the absence of discussion of the calculation of drawback in the remainder of the opinion, that *DuPont I* did not decide "the proper amount of DuPont's drawback."

The court is not convinced by plaintiff's argument that the Court of International Trade in *DuPont I* intended to award summary judgment in the amount of $37,540 because that was the amount of drawback sought in DuPont's summary judgment motion. Nothing in the *DuPont I* opinion so states. Nor is *DuPont I* correctly interpreted as an award of partial summary judgment under USCIT Rule 56(d); had it been such an award, the court would have identified controverted facts. *See* USCIT R. 56(d). Instead, *DuPont I* is correctly construed to award a judgment based on the absence of a genuine issue of material fact, and also to require Customs to make, "in accordance with this decision," an additional administrative determination of the exact amount of drawback to be paid upon the reliquidation of the drawback entry, on the basis of the uncontroverted facts. *DuPont I*, 24 CIT at 1051, 116 F. Supp. 2d. at 1350. The Court of International Trade in *DuPont I* specifically identified, among those uncontroverted facts, the information presented on the drawback entry form that Customs would require were Customs to

allocate "the duty paid between the synthetic rutile's titanium content and the other elements contained therein." *Id.* at 1050, 116 F. Supp. 2d at 1348. That information would have been irrelevant, and no such allocation could have occurred, had *DuPont I* considered DuPont to qualify for drawback in the full amount claimed in DuPont's motion for summary judgment. Although *DuPont I* decided, according to USCIT Rule 56(c), that DuPont was "entitled to *a* judgment as a matter of law," *the* judgment to which DuPont was entitled was a judgment directing Customs to reliquidate the drawback entry in accordance with the opinion in that case, and to approve the proposed drawback contract, *not* a judgment directing Customs to pay DuPont, upon reliquidation of the entry, an amount of drawback that the Court of International Trade had determined or intended. *See* USCIT R. 56(c) (emphasis added); *see also DuPont I*, 24 CIT at 1047-48, 1051, 116 F. Supp. 2d at 1346-47, 1350.

The court also must reject defendant's argument that under *DuPont I* Customs was *required* to award drawback in an amount reduced according to the percentage content of titanium in synthetic rutile. *See* Def.'s Mem. 14-16. The opinion in *DuPont I* does not state such a holding. The only sentence in the opinion that touches upon the general topic of a reduced amount of drawback is the following, from the passage quoted above: "However, since the uncontroverted Manufacturing Drawback Certificate contains the necessary percentages for making the calculation, this burden would not seem to be a sufficient reason for denying DuPont its relief." *DuPont I*, 24 CIT at 1050, 116 F. Supp. 2d at 1348-49; *see* Def.'s Mem. 16. This sentence does not support defendant's conclusion that *DuPont I* decided the specific way that DuPont's drawback was to be calculated upon reliquidation of the entry. The context of the sentence is not the statement of the holding of the case but is instead a refutation of the

government's argument that the difficulty of such a calculation was a barrier to DuPont's

obtaining any drawback.

In summary, the issue of the amount of drawback was not decided by *DuPont I*. As

discussed below, however, issue preclusion forecloses defendant's argument that only titanium

can be considered to be of the "same kind and quality." To the contrary, *DuPont I* decided that

synthetic rutile and the other three feedstocks are of the "same kind and quality" and therefore are

substitutable for drawback purposes.

  2.  Defendant Is Precluded from Contesting the Determination in *DuPont I* that the Imported
       Synthetic Rutile and the Substituted Feedstocks Were of the Same Kind and Quality

The parties disagree as to what constitutes the "merchandise" that is of the "same kind

and quality" within the meaning of the manufacturing substitution drawback provision, 19 U.S.C.

§ 1313(b). Plaintiff asserts that the synthetic rutile and the other three feedstocks are all of the

same kind and quality for manufacturing substitution drawback purposes.[9] Pl.'s Mem. 7, 13.

Although the government agrees that DuPont is entitled to drawback as a result of the judgment

in *DuPont I*, the government maintains that titanium, and only titanium, satisfies the same-kind-

and-quality requirement of the statute. Def.'s Mem. 18 (stating that "[b]ecause Section 1313(b)

permits drawback only on imported and substituted merchandise of the 'same kind and quality'

and, in this case, that is the titanium, the drawback payable to DuPont must be measured by the

_____

[9] Plaintiff asserts that
[i]n this case, instead of relying entirely on imported synthetic rutile as a source of
titanium, DuPont relies on imported synthetic rutile and domestic titanium-
bearing ores of the "same kind and quality." Section 1313(b) allows DuPont to
use any of these materials in its manufacture of titanium dioxide pigment for
export, and irrebuttably presumes that it used the imported synthetic rutile in the
manufacture of the exported articles.
Pl.'s Mem. 13.

titanium content only."). The court concludes that *DuPont I*, in ruling that DuPont was entitled to manufacturing substitution drawback, determined that the imported, designated synthetic rutile and the substituted feedstocks satisfy the "same kind and quality" requirement as set forth in 19 U.S.C. § 1313(b). Therefore, while the government's defense is not precluded by *res judicata*, the principle of issue preclusion does not permit defendant to relitigate the issue of whether the four feedstocks satisfy the same-kind-and-quality requirement of 19 U.S.C. § 1313(b).

The government interprets the decision of the Court of International Trade in *DuPont I* and the decision of the Court of Appeals in *International Light Metals* to hold that only titanium satisfied the same-kind-and-quality requirement of 19 U.S.C. § 1313(b). In so doing, the government misconstrues the holdings in both cases. The decision in *DuPont I* was based in part on the decision of the Court of Appeals in *International Light Metals*, which was decided while the issue of whether DuPont was entitled to manufacturing substitution drawback on Drawback Entry No. G82-0000542-5 was pending in *DuPont I*. *International Light Metals* did not hold that, of the imported titanium sponge and substituted titanium scrap, only titanium qualified as the "same kind and quality." As it stated twice in its opinion, the Court of Appeals in *International Light Metals* was deciding the question of whether 19 U.S.C. § 1313(b) allowed titanium alloy scrap, which consisted of titanium (of at least 99.3% purity) and other elements, to be substituted for imported titanium "sponge," which consisted of commercially pure titanium (of at least 99.3% purity). *See Int'l Light Metals*, 194 F.3d at 1363 (stating that "[t]he issue before us is whether, under 19 U.S.C. § 1313(b), ILM was entitled to a contract permitting drawback upon substituting titanium alloy scrap for titanium sponge."); *id.* at 1364 (identifying

the question before the Court of Appeals as "whether, under 19 U.S.C. § 1313(b), titanium-containing scrap may be substituted for titanium sponge.").

The issue had arisen after the importer, International Light Metals, Inc. ("ILM"), sought and obtained from Customs approval of a proposed contract for manufacturing substitution drawback. *Id.* at 1358. The approved drawback contract allowed ILM, a manufacturer and exporter of titanium alloy products, to import titanium sponge and substitute for it domestic titanium sponge meeting the same level of purity. *Id.* After Customs approved ILM's drawback contract, ILM began obtaining the titanium for manufacturing from a second source, domestic titanium alloy scrap. *Id.* The presence in the scrap of elements other than titanium did not prevent ILM from using the scrap in its manufacturing process; to the contrary, the alloying process made use of some of these elements. *Id.* at 1358-59. However, the use of the large solid pieces of scrap necessarily altered the manufacturing process.[10] *Id.*

Customs discovered in an audit that ILM, by using the scrap as the second source of titanium, had departed from the process Customs had approved in the drawback contract. *Id.*

---

[10] The Court of Appeals for the Federal Circuit described ILM's manufacturing process as follows:

> When the source material was titanium sponge, ILM compressed it with alloying elements such as aluminum, iron, copper, vanadium, and carbon. When the source material was alloy scrap in the form of chips and turnings, ILM compressed it with any additional materials needed, including titanium sponge. These compressed materials were welded to form an electrode in a process that took about six hours to complete. When using large solid pieces of alloy scrap, however, ILM did not compress the pieces, but instead hand-welded them to form the electrode, in a process that took approximately forty hours to complete. Under any circumstance, the entire manufacturing process took from two to three months to complete.

*Int'l Light Metals, A Div. of Martin Marietta Technologies, Inc. v. United States,* 194 F.3d 1355, 1358 (1999) ("*Int'l Light Metals*") (internal citations omitted).

Although the applicable regulations allowed drawback to be claimed upon a drawback contract that was amended retroactively, Customs denied, on two grounds, ILM's application for an amended drawback contract. *Id.* at 1359-60, 1362-63. The principal ground was a conclusion by Customs that the imported titanium sponge and the substituted titanium alloy scrap were not of the "same kind and quality" for substitution drawback purposes. *Id.* at 1362-63. Second, Customs noted the additional time required for the manufacturing process, *i.e.*, forty hours of manual welding as opposed to six hours of automatic welding, when ILM used the large solid pieces of alloy scrap as opposed to the sponge. *Id.* at 1358, 1363.

ILM relied on Treasury Decision ("T.D.") 82-36, a 1982 administrative decision, in arguing that the titanium sponge and the titanium alloy scrap it used were of the "same kind and quality." *Id.* at 1359; *see* T.D. 82-36, 16 Cust. B & Dec. 97, 97-98 (1982). Customs, in the audit report, rejected this argument, concluding that T.D. 82-36 allowed substitution drawback only if no more than one "sought" element is contained in the domestically produced product and if substitution does not significantly alter the manufacturing process. *Int'l Light Metals*, 194 F.3d at 1359. Customs denied ILM's drawback claims for which the substituted merchandise was titanium scrap, reasoning that the scrap contained sought elements other than titanium that were used in manufacturing the alloys. *Id.* With respect to the large solid pieces of scrap, Customs also concluded that T.D. 82-36 would not permit drawback because the forty hours of manual welding required for scrap as opposed to the six hours of automatic welding for sponge represented a significant change in the manufacturing process. *Id.* at 1358-59, 1363.

The Court of Appeals, reversing a decision of the Court of International Trade, rejected

the position of the United States.  Concluding that the titanium alloy scrap could be substituted

for the titanium sponge, the Court of Appeals found three points to be compelling:

> First, it is undisputed that the titanium in the scrap was identical to the titanium in
> the sponge that ILM imported.  Accordingly, the titanium in the domestic scrap
> was "of the same kind and quality" as the titanium in the imported sponge.
> Second, there is no dispute as to the amount of titanium that was in the scrap.  As
> a result, the amount of a drawback to which ILM would be entitled based upon the
> titanium in that scrap and the titanium in the imported sponge could be precisely
> determined.
>
> Third, the government's position results in a "no scrap" rule, one for which we
> find no support in the statute.  To explain, if ILM used imported or substituted
> domestic titanium sponge to make an alloy ingot from which exported articles
> were made, under the government's theory ILM would get a drawback duty for
> the amount of titanium sponge found in the exported articles.  But if the
> manufacturing process resulted in waste (scrap), or ILM used scrap from other
> sources, and ILM recycled the scrap into alloy ingots from which more articles for
> export were made, then no drawback would be paid for the amount of titanium
> sponge in the articles made from the "scrap" ingots, even if, as is the case here,
> the amount of titanium sponge in the scrap could be accurately determined.  If,
> however, ILM first expended the time and money to extract the titanium sponge
> from the scrap, then mixed the extract with other metals to form ingots from
> which exported articles were made, the government would allow drawback.

*Id.* at 1366.  Regarding the longer welding time required for scrap, the Court of Appeals found

that the difference in welding time (forty hours for scrap as opposed to six hours for sponge) was

not significant in the context of a process that takes two to three months to complete.  *Id.*

Defendant points to certain of the above-quoted language in the opinion of the Court of

Appeals for the proposition that only titanium qualifies as being of the same kind and quality.

*See* Def.'s Mem. 21 (quoting *Int'l Light Metals*, 194 F.3d at 1366).  In setting forth the three

points that the Court of Appeals found compelling in concluding that the titanium alloy scrap

could be substituted for the titanium sponge, the Court of Appeals stated that "it is undisputed

that the titanium in the scrap was identical to the titanium in the sponge that ILM imported" and

that "[a]ccordingly, the titanium in the domestic scrap was 'of the same kind and quality' as the

titanium in the imported sponge." *Int'l Light Metals*, 194 F.3d at 1366.  Defendant reads this

language to mean that ILM's drawback claim was limited by a finding that *only* the titanium was

of the same kind and quality.  Defendant's reading of the opinion, however, is overly selective,

overlooking the fact that the Court of Appeals was considering the issue of whether ILM's

proposed drawback contract was consistent with 19 U.S.C. § 1313(b).  That proposed contract

depended on the substitution of titanium scrap for titanium sponge, not titanium for titanium.

The Court of Appeals concluded that ILM's proposed drawback contract was consistent

with 19 U.S.C. § 1313(b), which necessarily required it to conclude that the substituted

merchandise, the titanium scrap, was of the same kind and quality as the imported, duty-paid

merchandise, the titanium sponge.  *See id.* at 1367.  The Court of Appeals relied on the

legislative history of the substitution drawback provision to resolve the substitution issue, for

which it viewed the "same kind and quality" phrase, standing alone, as insufficiently precise.  *Id.*

at 1364-66.

> Specifically, the unchanged purpose of section 1313(b) . . . was to facilitate honest
> drawback claims for such stable commodities as sugar, which present fungibility
> difficulties, i.e., difficulties in accounting for whether the imported merchandise
> has actually been used in the particular article.  We therefore inform our
> understanding of the phrase "same kind and quality" with the concern expressed
> in the legislative history about alleviating difficulties of proof in honest drawback
> cases.

*Id.* at 1366.

Contrary to defendant's interpretation of *International Light Metals*, the fact that titanium

in the sponge and in the scrap, being essentially identical, was of the "same kind and quality"

served as one of the three reasons the Court of Appeals gave for its conclusion that ILM was

entitled to drawback based on substitution of titanium scrap for titanium sponge. Later in the

opinion, the Court of Appeals stated that "[w]e thus conclude that ILM's proposal for a revised

drawback contract was consistent with the requirements of 19 U.S.C. § 1313(b) because the

titanium alloy scrap that ILM used in its manufacturing process contained titanium that was, in

the words of the statute, 'of the same kind and quality' as the titanium it imported." *Id.* at 1367.

This language, which references ILM's proposed drawback contract, cannot properly be

interpreted to disregard the fact that the proposed drawback contract was based on substitution of

titanium scrap for titanium sponge, not on the substitution of titanium for titanium. The language

neither states nor implies that the Court of Appeals considered the same-kind-and-quality

requirement to be met *only* by the titanium.

The government's reasoning that the substitution drawback statute, as construed by the

Court of Appeals in *International Light Metals*, limits DuPont's drawback by confining the

same-kind-and-quality merchandise to titanium is also unconvincing because of a difference in

the facts between the two cases. The designated merchandise in *International Light Metals* was

titanium; specifically, it was titanium sponge, a commercially pure form of titanium with a

minimum titanium content of 99.3%. *Id.* at 1357, 1360. In contrast, the designated merchandise

in this case is synthetic rutile, not titanium. The drawback entries of ILM that Customs had

approved prior to the litigation had substituted titanium sponge for titanium sponge, *i.e.*, titanium

for titanium. With respect to the entries requiring a revised drawback contract that Customs had

disallowed, the Court of Appeals was faced with the question of whether the presence of

substances other than commercially pure titanium in the *substituted* merchandise, including other

sought elements, was a reason to conclude that the titanium scrap did not qualify as substituted merchandise. These substances were not present in the *designated* merchandise. Under the holding in *International Light Metals*, the presence of these other substances in the substituted merchandise was no bar to drawback, and accordingly a drawback contract based on the use of the scrap as substituted merchandise was held to be permissible under the statute. *See id.* at 1366-67. According to the question presented upon appeal, either the scrap was substitutable for the designated titanium sponge or it was not. On the facts of *International Light Metals*, the Court of Appeals was not required to decide whether *only* the titanium in the scrap satisfied the same-kind-and-quality requirement and did not so decide.

*DuPont I* is properly interpreted to hold that the imported synthetic rutile and the four substituted feedstocks (only one of which was synthetic rutile) satisfy the same-kind-and-quality requirement. *DuPont I* arose after Customs, upon effecting the original liquidation of the drawback entry in 1996, had refused to allow DuPont any drawback on the drawback entry and had rejected DuPont's amended proposal for a drawback contract.[11] Compl. ¶¶ 11-13. Upon liquidation, Customs, maintaining the position it had taken twice previously in rejecting DuPont's original and amended proposals for a drawback contract, held that DuPont was entitled to no drawback because, according to Customs, DuPont's imported synthetic rutile and

---

[11] Under the Customs regulations applied by the Court of International Trade in *DuPont I*, DuPont could receive manufacturing substitution drawback upon approval by Customs of DuPont's proposed drawback "contract." *See DuPont I*, 24 CIT at 1046 n.1, 116 F. Supp. 2d at 1345 n.1; *see also* 19 C.F.R. §§ 191.21 & 191.23 (1996). The current regulations refer to the analogous procedure of a claimant's operating under a general or specific drawback "ruling" instead of a drawback "contract." *See* 19 C.F.R. § 191.7 (2007) (outlining procedures for operation under a general drawback ruling); *id.* § 191.8 (2007) (outlining procedures governing a specific drawback ruling).

substituted feedstocks were not of the "same kind and quality" as required for manufacturing

substitution drawback under 19 U.S.C. § 1313(b). *See id.* Exs. A-1 to A-6. Customs had

reached this decision by concluding that DuPont's proposed drawback contract did not meet the

requirements of T.D. 82-36 "because titanium was never isolated as an element during DuPont's

manufacturing process." *DuPont I*, 24 CIT at 1046, 116 F. Supp. 2d at 1345 (citing T.D. 82-36,

16 Cust. B & Dec. at 97-98). "Customs emphasized that the titanium actually used in the

manufacturing process was always combined with another element, i.e., oxygen, and that DuPont

was actually seeking titanium only as part of the compound titanium dioxide, and not as a

discrete element." *Id.* at 1046, 116 F. Supp. 2d at 1345.

In *DuPont I*, the Court of International Trade granted DuPont's motion for summary

judgment and ordered Customs to approve plaintiff's proposed drawback contract, to reliquidate

the drawback entry, and to pay the drawback claim in accordance with the court's decision. *Id.*

at 1051, 116 F. Supp. 2d at 1350. Applying the three factors employed by the Court of Appeals

in *International Light Metals*, 194 F.3d at 1366, the Court of International Trade in *DuPont I*

rejected Customs' reasoning and held that DuPont was entitled to manufacturing substitution

drawback. *See DuPont I*, 24 CIT at 1049-50, 116 F. Supp. 2d at 1348-49. Regarding the first

factor, the Court of International Trade, observing that the titanium in the four feedstocks was

identical, concluded that the "same kind and quality" requirement in the statute had been

satisfied. *Id.* at 1049, 116 F. Supp. 2d at 1348. Applying the second factor, the court noted that

the amount of titanium found in each of the feedstocks could be precisely determined. *Id.*

at 1049-50, 116 F. Supp. 2d at 1348-49. Third, the court found no support for the position "that,

during the manufacturing process, titanium must be extracted as a discrete element from the various feedstocks . . . ." *Id.* at 1050, 116 F. Supp. 2d at 1349.

In discussing the issue of a change in the manufacturing process resulting from substitution, the Court of International Trade in *DuPont I* considered specifically "the question of whether or not the substitution of another feedstock for synthetic rutile would sufficiently alter DuPont's manufacturing process so as to defeat the notion that the *feedstocks* are *of the same kind and quality*." *Id.* at 1050-51, 116 F. Supp. 2d at 1349 (emphasis added). *DuPont I* concluded that the alteration was not sufficient to defeat the notion that the feedstocks were of the same kind and quality. *Id.* at 1051, 116 F. Supp. 2d at 1349-50. The resolution of this issue by *DuPont I* is inconsistent with defendant's interpretation that *DuPont I* found only titanium to satisfy the same-kind-and-quality requirement.

In summarizing its holding and underlying reasoning, the Court of International Trade in *Dupont I* relied on the holding in *International Light Metals*:

> Thus, this Court finds itself in the same posture as the Federal Circuit in [*International Light Metals*], and is therefore bound by that court's construction of 19 U.S.C. § 1313(b). In [*International Light Metals*], the Federal Circuit found that titanium sponge was eligible for drawback when titanium scrap was used in its place in a manufacturing process which required titanium metal. *See* [*International Light Metals*], 194 F.3d at 1367. The Federal Circuit held that the scrap satisfied the statutory requirement that the "merchandise" (titanium scrap) be of the "same kind and quality" as the imported "merchandise" (titanium sponge) for which it was substituted. *See id.* The Federal Circuit reached its conclusion even though the scrap, unlike the sponge, contained other metals which were salvaged as part of the manufacturing process, and even though the welding step of the manufacturing process took longer when scrap was used. *See id.* at 1366.

*Id.* at 1048-49, 116 F. Supp. 2d at 1347-48. Later in the opinion, the court in *DuPont I* rejected

the government's argument that the four feedstocks were not of the same kind and quality

because they were not classified under the same tariff provision:

> Furthermore, the Government's argument that the four source feedstocks were not
> at the time of this action classified under the same tariff provision and are,
> therefore, not of the "same kind and quality," is not compelling. This Court need
> not grant formal deference to T.D. 82-36 to note its statement of the self-evident,
> i.e., "[s]ame kind and quality does not . . . depend on the tariff schedules and
> never has. Often items classified under the same tariff provisions and subject to
> the same duty are not of the same kind and quality and vice versa."

*Id.* at 1050, 116 F. Supp. 2d at 1349 (ellipse in original and internal citations omitted). The court

in *DuPont I*, after considering the competing arguments, again expressed a conclusion that it

would not have reached, and would not have had occasion to reach, had it considered the same-

kind-and-quality requirement to be satisfied only by titanium and not by the imported synthetic

rutile and the substituted feedstocks.

Accepting defendant's argument that *DuPont I* limited its analysis of "same kind and

quality" to the titanium element would require the court to ignore an important holding of

*DuPont I*: the holding that DuPont's proposed drawback contract was consistent with 19 U.S.C.

§1313(b) and must be approved. *See id.* at 1051, 116 F. Supp. at 1350 (ordering that

"[a]ccordingly, Customs is instructed to approve the proposed drawback contract as revised by

DuPont on or about March 4, 1994 . . . ."). The proposed drawback contract, which now is an

approved drawback contract as a result of *DuPont I*, designates for drawback "titanium ores and

concentrates," "rutile (synthetic and natural)," and "titania slag" and lists the same substances as

the merchandise that is "of the same kind and quality as that designated which will be used in the

production of the exported products." Compl. Ex. A-4 at 2.

In making the argument that *DuPont I* considered only the titanium, and not the feedstocks, to be of the "same kind and quality," defendant points to the passage from the opinion in that case in which the Court of International Trade cites *International Light Metals* and explains that

> the court [in *International Light Metals*] reasoned that the phrase "same kind and quality" should be applied only to the sought element contained in a source material, and not to the source material as a whole or the impurities contained therein. Thus, although different ores may be made up of a number of elements, the "same kind and quality" standard applies only to the element used in manufacturing the exported article.

*DuPont I*, 24 CIT at 1049, 116 F. Supp. 2d at 1348 (internal citation omitted); *see* Def.'s Mem. 2-3. *DuPont I* reasoned that, as in *International Light Metals*, "the titanium contained in the imported and domestic feedstocks is of the 'same kind and quality' under 19 U.S.C. § 1313(b)." *Id.* The government's argument errs is in drawing from this language – despite the context provided by other language in the opinion and the order to approve the proposed drawback contract – the unwarranted conclusion that *DuPont I* considered *only* the titanium to meet the same-kind-and-quality requirement and considered the imported synthetic rutile and the substituted feedstocks *not* to be of the same kind and quality. As shown by the opinion when read in its entirety, *DuPont I* reached the opposite conclusion. In summary, the court concludes that defendant, in arguing that the "merchandise" held in *DuPont I* to be of the same kind and quality as the imported merchandise was titanium, and not the imported feedstocks, has misread both *DuPont I* and *International Light Metals*.

D.  Customs Erred in Basing its "Apportionment" on its "Same Kind and Quality" Finding

As a consequence of the determination in *DuPont I* that all four feedstocks are of the same kind and quality, and as a consequence of the approval of the drawback contract, the court must conclude that DuPont's drawback claim is properly based on the substitution of synthetic rutile and the other three feedstocks (*i.e.*, ilmenite, rutile, and titania slag) for the imported, duty-paid synthetic rutile that DuPont designated for drawback.  The court further concludes that 19 U.S.C. § 1313(b), when construed according to the plain meaning and the legislative history, did not permit Customs to rely on its "same-kind-and-quality" conclusion as a basis for its reducing, or "apportioning," DuPont's drawback according to the amount of titanium present in synthetic rutile.

In authorizing manufacturing substitution drawback, 19 U.S.C. § 1313(b) provides in pertinent part as follows:

> If imported duty-paid merchandise and any other merchandise (whether imported or domestic) *of the same kind and quality* are used in the manufacture or production of articles within a period not to exceed three years from the receipt of *such imported merchandise* by the manufacturer or producer of such articles, there shall be allowed upon the exportation . . . of any such articles, notwithstanding the fact that none of the imported merchandise may actually have been used in the manufacture or production of the exported . . . articles, *an amount of drawback equal to that which would have been allowable had the merchandise used therein been imported* . . . ; but the total amount of drawback allowed upon the exportation . . . of such articles, together with the total amount of drawback allowed in respect of such imported merchandise under any other provision of law, shall not exceed 99 per centum of the duty paid on such imported merchandise.

19 U.S.C. § 1313(b) (emphasis added).[12] According to the uncontested facts, the "imported duty-paid merchandise" that was received by DuPont and used in manufacturing TiPure was synthetic rutile, not titanium.[13] Because synthetic rutile and the other feedstocks are all of the "same kind and quality" for purposes of 19 U.S.C. § 1313(b), DuPont potentially is entitled to drawback in an amount "equal to that which would have been allowable had the merchandise used therein been imported." *Id.*

Customs, apparently for some time, has construed the words "had the merchandise used therein been imported" to mean "had the merchandise used therein been the imported, duty-paid merchandise." *Id.*; *see* T.D. 82-36, 16 Cust. B & Dec. at 97-98. The Customs Regulations in effect since a 1998 amendment have been consistent with this construction in providing that "[t]he amount of [manufacturing substitution] drawback allowable cannot exceed that which would have been allowable *had the merchandise used therein been the imported, duty-paid merchandise.*" *Drawback*, 63 Fed. Reg. 10,970, 11,016 (Mar. 5, 1998) (emphasis added) (setting forth 19 C.F.R. § 191.22 on substitution drawback); T.D. 98-16, 32 Cust. B. & Dec. 35, 156 (1998) (emphasis added) (also setting forth 19 C.F.R. § 191.22 on substitution drawback). While not the only possible construction, this construction is not at odds with the statutory language,

---

[12] The substitution drawback provision was amended in 1993 by the North American Free Trade Agreement Implementation Act, Pub. L. No. 103-182, § 632, 107 Stat. 2057, 2192-2198 (1993), in ways not directly pertinent to the issues presented by this case. Congress intended the 1993 amendment to apply to drawback entries made before the date of enactment if the liquidation of such entries was not final on the date of enactment. *See* H.R. Rep. No. 103-361(I) at 132 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 2552, 2682; S. Rep. No. 103-189 at 84-85 (1993).

[13] In this case, defendant has not disputed that the designated quantity of imported, duty-paid synthetic rutile was used in manufacturing within three years of such receipt by DuPont.

appears reasonable in allowing practical administration (by avoiding the need to determine

drawback based on the tariff treatment of the merchandise substituted for the imported

merchandise), and deserves deference. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council,*

*Inc.*, 467 U.S. 837, 842-44 (1984). Both parties agree with this construction. Pl.'s Resp. to

Questions Posed by the Ct. in its Letter to Counsel Dated May 19, 2005 at 13; Responses to

Questions in Ct.'s May 19, 2005 Letter at 2.

Because the feedstocks, and not merely titanium contained therein, are substitutable, the

construction of 19 U.S.C. § 1313(b) applied by Customs, and advocated by defendant in this

litigation, fails to afford DuPont "drawback equal to that which would have been allowable had

the merchandise used therein" been the imported, duty-paid merchandise. 19 U.S.C. § 1313(b).

In other words, that statutory construction does not allow the same maximum amount of

drawback for manufacturing substitution drawback as would be allowed for manufacturing same

condition drawback. Because the substituted feedstocks have been found to be of the same kind

and quality as the designated synthetic rutile, the statute, when construed according to its plain

meaning, potentially affords DuPont drawback equal to the same condition drawback that

DuPont could have obtained had the substituted feedstocks that DuPont used in producing the

6,961,934 pounds of exported TiPure been the imported, duty-paid merchandise. The 6,762,693

pounds of imported, duty-paid synthetic rutile that DuPont designated for drawback contained

the equivalent of 3,716,493 pounds of titanium, based on the uncontested facts (the imported

synthetic rutile is comprised of 91.7% titanium dioxide by weight and the percentage of the

molecular weight of the titanium dioxide molecule represented by the atomic weight of the

titanium atoms therein is 59.93%). Upon a showing that the quantity of merchandise DuPont

used to produce the exported TiPure (which consisted of the substituted feedstocks or the substituted feedstocks in combination with designated synthetic rutile) contained the equivalent of 3,716,493 pounds of the element titanium (a quantity determined according to stoichiometric substitution based on titanium content, as contemplated by *DuPont I*), DuPont theoretically would qualify for drawback of 99% of the duties paid on the 6,762,693 pounds of imported, designated synthetic rutile. That amount of drawback is $37,542.[14] The construction of the statute advocated by defendant, however, would disallow that amount and impose an additional step to "apportion" the drawback. In so doing, that construction is at odds with the plain meaning of the statute.

The court's conclusion that this construction is impermissible is grounded not only in the plain meaning but also in the relevant legislative history. In its opinion in *International Light Metals*, the Court of Appeals presented a detailed discussion of the purpose of manufacturing drawback, tracing the history of the current drawback law and its antecedent provisions. *See* 194 F.3d at 1364-66. The Court of Appeals observed that the purpose of manufacturing drawback is to provide U.S. manufacturers a rebate of duties paid on imported materials so that these manufacturers may compete in foreign markets with like articles manufactured in foreign countries. *Id.* at 1364-65.

> "The objects of [the drawback provision] were evidently not only to build up an export trade, but to encourage manufactures in this country, where such manufactures are intended for exportation, by granting a rebate of duties upon the raw or prepared materials imported, and thus enabling the manufacturer to

---

[14] This amount of drawback is obtained by dividing the 6,762,693 pounds of imported synthetic rutile by the total amount imported, 11,248,972 pounds of synthetic rutile, multiplying the resulting percentage by the total duties paid on the consumption entry ($63,077), and reducing the total of $37,920.83 by the 1% drawback fee.

compete in foreign markets with the same articles manufactured in other countries."

*Id.* at 1364 (quoting *Tide Water Oil Co. v. United States*, 171 U.S. 210, 216 (1898)).  The Court of Appeals confirmed that "[t]hese objectives survive in the present embodiment of the drawback statute."  *Id.* at 1364 n.12 (citing *Texport Oil Co. v. United States*, 185 F.3d 1291, 1296-97 (Fed. Cir. 1999)).

The manufacturing substitution drawback provision is intended to further the same general purpose as is the direct identification drawback provision, *i.e.*, enabling the manufacturer to compete in foreign markets by rebating 99% of the duties paid on imported merchandise, where the requirements for exportation and the additional requirements for substitution are satisfied.  This much is apparent from the legislative history to the 1958 amendment to the drawback law that extended to all goods the procedure for manufacturing substitution drawback, which under the Tariff Act of 1930 previously had been limited to sugar, nonferrous metals, and ores containing nonferrous metals.[15]  *See* S. Rep. No. 85-2165 (1958), *as reprinted in* 1958 U.S.C.C.A.N. 3576, 3576-78.  The legislative history confirms that Congress, in expanding the scope of manufacturing substitution drawback, intended to relieve U.S. manufacturers of the difficulty and expense of specifically identifying the imported materials that had been used in manufacturing exported products, thus facilitating their claims for drawback.  *Id.*, *as reprinted in*

---

[15] Because the original substitution drawback provision included in the Tariff Act of 1930 allowed substitution drawback for nonferrous metals (such as titanium) and ore containing nonferrous metals, DuPont's drawback claim appears to be of a type contemplated under the substitution provision that was in effect prior to the 1958 amendment, as well as under the 1958 amendment itself.

1958 U.S.C.C.A.N. at 3577-78.  The Senate Report accompanying the legislation provided in

pertinent part as follows:

> The payment of drawbacks is designed to relieve domestic processors and
> fabricators of imported dutiable merchandise, in competing for export markets, of
> the disadvantages which the duties on the imported merchandise would otherwise
> impose upon them.  Such relief for processors and fabricators has long been
> regarded as a concomitant of the tariff system.  Provision for drawback of duties
> paid on imported merchandise used in the production of exported articles has,
> accordingly, been a feature of United States tariff legislation for a long time.
>
> The substitution provision was first introduced in the Tariff Act of 1930.  It
> was designed to relieve processors and fabricators of products made from these
> materials of the difficulty and expense of specifically identifying the imported
> materials that had been used in the production of exported products in order to
> establish eligibility for drawback.  In support of the provisions as originally
> enacted in the 1930 act, it was pointed out that sugar refiners and processors of
> nonferrous metal ores frequently use raw materials of both foreign and domestic
> origin and that only with great inconvenience and expense could these processors
> conduct their operations in such a way as to separately identify that part of their
> output containing imported materials and the actual amounts so used.  From time
> to time since the original substitution provision was added to the drawback
> section in the Tariff Act of 1930, other articles have been included in the list of
> articles on which substitution is permitted.  The original provision for nonferrous
> metals and ore containing nonferrous metals was broadened to extend to all
> metals; flaxseed and linseed oil was added; and finally, printing paper, coated or
> uncoated, was added.

*Id.*, *as reprinted in* 1958 U.S.C.C.A.N. at 3577-78.

The construction of the substitution drawback provision that Customs applied in denying

the protest of the reliquidation, and that defendant advocates in this litigation, is at odds with the

statutory purpose underlying manufacturing drawback generally, and manufacturing substitution

drawback in particular, as revealed in the legislative history.  Under that construction, DuPont

has no means of obtaining, under substitution drawback, the same drawback it could have

obtained under direct identification drawback, *i.e.*, 99% of the duties paid on the imported

synthetic rutile, had DuPont used only imported synthetic rutile in manufacturing the exported product. Once it has been determined, as it has in *DuPont I*, that the substituted merchandise is of the same kind and quality as the designated merchandise, a claimant, if satisfying all procedural requirements, potentially is entitled to more drawback than the construction of the statute applied by Customs would allow.[16] Under the construction of the statute applied by Customs, the statute cannot achieve its intended purpose of enabling these manufacturers to compete in foreign markets with producers located outside the United States, because the intended refund of 99% of the duties paid on the imported merchandise is not available, even on a claim made according to the "used-in" basis allowed by the former and current regulations.

As the legislative history of the 1958 amendment demonstrates, Congress intended to "relieve processors and fabricators of products made from these materials of the difficulty and expense of specifically identifying the imported materials that had been used in the production of exported products in order to establish eligibility for drawback." S. Rep. No. 85-2165 (1958), *as reprinted in* 1958 U.S.C.C.A.N. at 3577-78. In referring to "the difficulty and expense of

---

[16] The Interim Rule and Final Rule also appear to be intended to disallow the full amount of drawback available under the statute on the facts of this case, although the change made by the Final Rule applies only when "the designated merchandise is a chemical element that was contained in imported material that was subject to an *ad valorem* rate of duty, and a substitution drawback claim is made based on that chemical element." *Manufacturing Substitution Drawback: Duty Apportionment*, 67 Fed. Reg. 48,368, 48,370 (July 24, 2002) (Interim Rule); *Manufacturing Substitution Drawback: Duty Apportionment*, 68 Fed. Reg. 50,700, 50,702-03 (Aug. 22, 2003) (Final Rule) (setting forth an example to paragraph (b)(4) that identifies titanium, not the synthetic rutile, as the designated merchandise in the example apparently based on DuPont's entry); 19 C.F.R. § 191.26(b)(4) & Example to paragraph (b)(4) (2003). However, imported, duty-paid synthetic rutile, not titanium, is the designated merchandise in this case. The apparent intent of the Interim Rule and Final Rule is that the synthetic rutile is not "eligible imported duty-paid merchandise" for purposes of designation under § 191.2(f). 19 C.F.R. § 191.2(f) (2003). The issue of whether the Final Rule is permissible under the statute is not before the court in this litigation.

specifically identifying the imported materials that had been used in the production of exported products," the Senate Report unquestionably is referring to the difficulty and expense that would attend a direct identification drawback claim.  *See id.*, *as reprinted in* 1958 U.S.C.C.A.N. at 3577-78.  Rather than relieve processors such as DuPont of this difficulty and expense, as the statute intended, the construction of the statute advanced by the United States frustrates the statutory purpose by making it impossible for DuPont to make a substitution drawback claim that is the equivalent of a direct identification drawback claim.  In other words, as a price for obtaining the relief from "the difficulty and expense of specifically identifying the imported materials that had been used in the production of exported products," this construction in effect demands that DuPont relinquish approximately 45% of the drawback it otherwise could have obtained.  If DuPont had used only imported, duty-paid synthetic rutile, and no substituted feedstocks, in producing the 6,961,934 pounds of TiPure pigment that it exported, DuPont would have been eligible to receive, under procedures authorized by § 1313(a), drawback in the amount of 99% of the duties paid on the imported synthetic rutile that it used for that purpose, *i.e.*, $37,542.  The result of defendant's construction is that DuPont's choice to proceed under manufacturing substitution drawback, instead of potentially qualifying DuPont to receive that same amount, came at the cost of 45% of its drawback claim.  Such a result cannot be reconciled with the language of § 1313(a) and (b) as interpreted consistently with the statutory purpose revealed in the legislative history.

### E.  The Final Rule Does Not Merit *Chevron* Deference

In arguing that 19 U.S.C. § 1313(b) authorizes drawback only in an amount reduced according to the relative weight of titanium in the imported synthetic rutile, defendant raises a deference argument that relies on *Chevron*, 467 U.S. at 842-44.  Defendant argues that the construction of the drawback statute under which Customs limited DuPont's drawback in HQ 229433 is entitled to deference under *Chevron* because it subsequently was adopted in the Final Rule, promulgated on August 22, 2003 following a notice and comment procedure and codified at 19 C.F.R. § 191.26(b)(4), and must be upheld as a reasonable construction of the statute.  Def's Mem. 10-13.  Defendant relies on *United States v. Haggar Apparel Co.*, 526 U.S. 380 (1999), in arguing that Customs regulations interpreting the tariff statute are entitled to *Chevron* deference, and on *Smiley v. Citibank*, 517 U.S. 735 (1996), in arguing that *Chevron* deference is due even though the Final Rule was promulgated after the commencement of this litigation.  *Id.* at 11-13.  According to defendant, *Chevron* deference would be owed even to a regulation prompted by litigation.  *Id.* at 12-13.

The court does not agree with defendant's argument that the method Customs used to determine DuPont's drawback in HQ 229433 became entitled to *Chevron* deference once Customs had promulgated the Final Rule.  The Supreme Court indicated in *Chevron* that judicial deference to an agency action may apply "[w]hen a court reviews an agency's construction of the statute which it administers . . . ." *Chevron*, 467 U.S. at 842.  The Supreme Court reasoned that "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Id.* at 843-44.  Referring to the principle of judicial deference upon which it relied in *Chevron*, the

Supreme Court has instructed that "[j]udicial deference to reasonable interpretations by an agency of a statute that it administers is a dominant, well-settled principle of federal law." *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417 (1992).

Courts have recognized that *Chevron* deference does not extend to a decision that an agency bases on its interpretation of a judicial precedent rather than its construction of the statute it is administering. *See Akins v. Fed. Election Comm'n*, 101 F.3d 731, 740 (D.C. Cir. 1996) (declining to grant deference under *Chevron* to a decision by the Federal Election Commission ("FEC") in which the FEC determined that an entity was not a "political committee" according to the Commission's interpretation of Supreme Court precedent); *Blackburn v. Reich*, 79 F.3d 1375, 1377 n.3 (4th Cir. 1996) (refusing to grant *Chevron* deference to the Secretary of Labor's decision to deny attorneys' fees and costs for appellate review because that decision was apparently based not on the Secretary's interpretation of the governing statute but rather on the Secretary's belief that he was required to follow a holding of the Court of Appeals for the Sixth Circuit); *Thomas Hodgson & Sons, Inc. v. Fed. Energy Regulatory Comm'n*, 49 F.3d 822, 823, 826 (1st Cir. 1995) (rejecting the Federal Energy Regulatory Commission's claim of *Chevron* deference for the decision to assert licensing jurisdiction over a hydroelectric facility because the Commission did not base its decision on an interpretation of the relevant statute but instead looked to case law, and because the decision was contrary to clear congressional intent).

The constructions by Customs of the manufacturing substitition drawback provision that resulted in *International Light Metals* and *DuPont I*, both of which constructions denied any drawback, were rejected by the Court of Appeals and the Court of International Trade, respectively. The notices Customs issued to promulgate the Interim and Final Rules reveal that

Customs did not base the Final Rule on its own construction of the drawback statute. In promulgating the Interim Rule, Customs stated that it was doing so to implement the holdings in *DuPont I* and *International Light Metals* and relied on this rationale for placing the rule into effect as an interim rule prior to conducting a public comment procedure. *See Interim Rule*, 67 Fed. Reg. at 48,369 (stating that "Customs has determined that prior public notice and comment procedures on this regulation are unnecessary and contrary to public interest" and that "[t]he regulatory changes to the Customs Regulations add language necessitated by recent decisions of the Court of International Trade and the Court of Appeals for the Federal Circuit"). The notice announcing the Final Rule does not state to the contrary or imply a changed rationale; the only changes made to the Interim Rule were "non-substantive editorial changes" and a change to correct what a commenter, and Customs, considered to be an error in the drawback calculation in one of the examples (the "synthetic rutile" example apparently based on DuPont's drawback issue) that was presented in the text of the Interim Rule. *Final Rule*, 68 Fed. Reg. at 50,702. Customs rejected all other comments, relying in part on the claim that the holdings in *DuPont I* and *International Light Metals* do not permit Customs to adopt those comments. *Id.* at 50,701-02. In summary, the Final Rule does not qualify for deference under *Chevron* because it is based not on the agency's own construction of the drawback statute but instead on the interpretations Customs placed on the holdings of *International Light Metals* and *DuPont I.*

F.  Although HQ 229433 Is of a Type Potentially Qualifying for Deference under *Skidmore*, It Is Unpersuasive Because It Is Based on Faulty Reasoning

In arguing that 19 U.S.C. § 1313(b) authorizes drawback only in an amount reduced according to the relative weight of titanium in the imported synthetic rutile, defendant also raises

a deference argument that relies on *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Defendant

argues that even absent the subsequently-promulgated regulation, the method Customs used to

calculate DuPont's drawback, as presented in HQ 229433, the 2002 Customs ruling directing the

denial of the protest of the reliquidation, is entitled to the measure of deference held to apply to

certain administrative issuances in *Skidmore*, 323 U.S. 134, and afforded to a Customs ruling in

*United States v. Mead Corp.*, 533 U.S. 218 (2001). Def.'s Mem. 10 n.5.

In *Skidmore*, the Supreme Court concluded that certain "rulings, interpretations and

opinions" of the Administrator under the Fair Labor Standards Act, "while not controlling upon

the courts by reason of their authority, do constitute a body of experience and informed judgment

to which courts and litigants may properly resort for guidance." *Skidmore*, 323 U.S. at 140. The

Supreme Court concluded, therefore, that "[t]he weight of such a judgment in a particular case

will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its

consistency with earlier and later pronouncements, and all those factors which give it power to

persuade, if lacking power to control." *Id.* The Supreme Court subsequently concluded in *Mead*

that

> *Chevron* did nothing to eliminate *Skidmore*'s holding that an agency's
> interpretation may merit some deference whatever its form, given the 'specialized
> experience and broader investigations and information' available to the agency,
> 323 U.S., at 139, and given the value of uniformity in its administrative and
> judicial understandings of what a national law requires, *id.*, at 140.

*Mead*, 533 U.S. at 234 (quoting *Skidmore*, 323 U.S. at 139-40).

In directing the denial of DuPont's protest of the reliquidation, HQ 229433 cites various

grounds, including the interpretation Customs places on *DuPont I* and *International Light*

*Metals*, but it also cites previous Customs rulings and policies. *See* HQ 229433 (May 10, 2002),

*available at* 2002 WL 1584373.  The court concludes that this ruling is of a type that may be

owed *Skidmore* deference.  That Customs did not base HQ 229433 principally on its own

construction of the drawback statute is not a basis for denial of *Skidmore* deference.  The

Supreme Court acknowledged in *Skidmore* that the rulings of the Administrator of the Fair Labor

Standards Act "do not constitute an interpretation of the Act or a standard for judging factual

situations which binds a district court's processes, as an authoritative pronouncement of a higher

court might do." *Skidmore*, 323 U.S. at 139.  However, even when considered with the benefit of

*Skidmore* deference, HQ 229433 is unpersuasive because it rests on faulty reasoning.

### 1.  Customs, in HQ 229433, Misinterprets Judicial Precedent Regarding "Apportionment" of Drawback

Among other errors, Customs, in the HQ 229433 ruling, misinterprets the holdings in

*International Light Metals* and *DuPont I* in the same way that defendant does in this case.

HQ 229433 states that "[i]n DuPont's case, the merchandise of the 'same kind and quality' upon

which its § 1313(b) drawback claim is based is titanium."  HQ 229433 (May 10, 2002), *available*

*at* 2002 WL 1584373 at *3.  "This fact was understood by the CIT and is evidenced by its

language." *Id.* (citing *DuPont I*, 24 CIT at 1046, 116 F. Supp. 2d at 1345).  The portion of the

*DuPont I* opinion that the ruling initially cites in support of this incorrect conclusion consists of

two sentences from the second paragraph of the background section of the opinion, not from the

discussion portion of the opinion, which, as discussed previously, concludes that the imported

synthetic rutile and the other feedstocks *were* of the same kind and quality.  *See DuPont I*,

24 CIT at 1048-51, 116 F. Supp. 2d at 1347-50.  The discussion in the background section is not

correctly interpreted to mean that titanium is the only material satisfying the same-kind-and-quality requirement in the statute.

HQ 229433 errs in stating that "[t]he CIT in [*DuPont I*], following the Federal Court [*sic*] in [*International Light Metals*], held that the titanium in the imported feedstock was the merchandise of the 'same kind and quality' as the titanium in the exported pigment." HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *2 (internal citation omitted).  As discussed previously in this Opinion, neither *International Light Metals* nor *DuPont I* considered titanium to be the *only* substance that satisfied the same-kind-and-quality requirement in the statute.  To the contrary, the two cases considered and decided, in favor of the plaintiffs, the respective issues of whether manufacturing substitution drawback was available based on the substitution of titanium scrap for imported titanium sponge (in *International Light Metals*) and whether such drawback was available based on the substitution of the four feedstocks for the imported synthetic rutile (in *DuPont I*).  HQ 229433 concludes that "[b]oth the Federal Circuit and the CIT stated unequivocally that the drawback claimed in these cases was to be based on the amount of titanium contained in the imported and exported materials."  *Id.* at *3.  Although both decisions recognized that titanium content served as the basis for determining the quantity of merchandise needed to substitute for the designated merchandise, Customs proceeded to draw an incorrect conclusion in the next sentence in the ruling: "Hence, Customs was obligated to follow these decisions and apportion the drawback claimed by DuPont according to the titanium content in the merchandise and manufactured articles."  *Id.*  The holdings in *International Light Metals* and *DuPont I* did not concern the question of "apportionment" to which HQ 229433 alludes.

## 2. Customs, in HQ 229433, Erred in Applying Retroactively the Drawback Regulations as Amended in 1998

In support of its conclusion that DuPont's drawback "must be measured by the amount of titanium in the imported and substitute merchandise," HQ 229433 relies on a provision of the then-current Customs regulations, 19 C.F.R. § 191.23(b) (2002). HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *3. The court concludes, however, that this provision, which was promulgated in 1998 and is still in effect, does not apply to DuPont's drawback contract and drawback claim.

Section 191.23(b) sets forth the "appearing in" basis of claiming drawback and provides that "[d]rawback is allowable under this method based only on the amount of imported or substituted merchandise that appears in (is contained in) the exported articles." 19 C.F.R. § 191.23(b). Section 191.23(b) distinguishes "appearing in" drawback claims from the "used in" drawback claims described in § 191.23(a) and the "used-in-less-valuable-waste" claims described in § 191.23(c). *Id.* § 191.23(a)-(c).

An appendix to the current regulations (Appendix B), in setting forth sample formats for specific manufacturing drawback rulings, clarifies that any waste resulting from the use of the designated or substituted merchandise in the manufacturing process, regardless of whether the waste is valuable or valueless, and regardless of whether the waste is recoverable or irrecoverable, reduces the amount of drawback when a drawback claim is made on the "appearing-in" basis. *See* 19 C.F.R. Part 191 App. B (2002). Appendix B distinguishes the appearing-in basis from the used-in and used-in-less-valuable-waste bases, under which irrecoverable or valueless waste does not reduce the amount of drawback, clarifying that this

distinction applies both to manufacturing direct identification and to manufacturing substitution

drawback claims and providing illustrative examples. *See id.* The text of Appendix B, together

with the examples, informs the reader that under an appearing-in claim for manufacturing

substitution drawback, the quantity of the waste, whether valuable or valueless (and whether

recoverable or irrecoverable), reduces on a unit-for-unit basis, not on the basis of value, the

quantity of the designated merchandise on which drawback is payable. *See id.*

The court concludes that if the current § 191.23(b) were applied to DuPont's drawback

claim according to the drawback contract, the amount of drawback determined by HQ 229433,

$20,822, if reduced by the 1% drawback fee, would be correct. As the complaint states, DuPont

manufactures TiPure pigment in a process that extracts titanium from the feedstocks and

combines it with oxygen in a multi-step industrial process. Compl. ¶ 7. The portion of the

imported synthetic rutile or substituted merchandise that can be considered to "appear in" the

exported TiPure consists solely of the extracted titanium that, in the form of titanium dioxide,

was combined with other materials to formulate the TiPure. *Id.* The process results in waste

products that include oxygen and metal chlorides, including iron chloride. *Id.*; Norman Shurak

Decl.; *Approved Drawback Contract* Attach. A.

In HQ 229433, however, Customs did not address the issue of why § 191.23(b) should be

applied retroactively and instead presumed that it governs issues arising under DuPont's

drawback contract and the subject drawback entry. *See* HQ 229433 (May 10, 2002), *available at*

2002 WL 1584373 at *3. The provision, and the explanatory Appendix B as well, were

promulgated as part of a major revision of the Customs drawback regulations promulgated in

1998. *Drawback*, 63 Fed. Reg. 10,970; T.D. 98-16, 32 Cust. B. & Dec. 35. Subsections (a), (b),

and (c) of § 191.23 are designated in the Parallel Reference Table included in the 1998 revision

as "new" subsections. *Drawback*, 63 Fed. Reg. at 11,000; T.D. 98-16, 32 Cust. B. & Dec. at 119.

The effective date of the new regulations was April 6, 1998. *Drawback*, 63 Fed. Reg.

at 10,970; T.D. 98-16, 32 Cust. B. & Dec. at 35. Concerning retroactive effect of the 1998

amendments, Customs stated in the preamble to the amendments that existing drawback

contracts may continue to be relied upon by the manufacturer or producer provided they did not

materially conflict with the statute or the new regulations. *Drawback*, 63 Fed. Reg. at 10,977;

T.D. 98-16, 32 Cust. B. & Dec. at 55. Customs further stated that

> [a] drawback entry based upon [an] existing drawback 'contract' which materially
> conflicts with these regulations and for which exportation is before the effective
> date of these regulations is governed by the existing drawback "contract", unless
> there is also a necessary material conflict with the amendments to the statute
> (19 U.S.C. 1313) made by the NAFTA Implementation Act (Public Law 103-182,
> § 632), in which case the effective date of § 632 of that Act controls.

*Drawback*, 63 Fed. Reg. at 10,977; T.D. 98-16, 32 Cust. B. & Dec. at 55.

Although the "appearing-in" and "used-in" bases for claiming drawback existed under the

previous regulations, the 1998 revision expanded on the meanings given to those terms, added

clarifying language and examples, and subdivided the previous used-in basis to recognize

specifically a new, more limited used-in basis and to treat as a separate basis the "used-in-less-

valuable-waste" basis. *See Drawback*, 63 Fed. Reg. at 11,017 (setting forth 19 C.F.R. § 191.23);

T.D. 98-16, 32 Cust. B. & Dec. at 157-58 (setting forth 19 C.F.R. § 191.23). The court

concludes that the issue of how much drawback is available under DuPont's appearing-in claim

is not properly decided according to a retroactive application of the 1998 regulatory amendments

but instead must be resolved under the previous regulations, which were promulgated in 1983.

*See Customs Regulations Revision Relating To Drawback; Specialized and General Provisions*,

48 Fed. Reg. 46,740 (Oct. 14, 1983); T.D. 83-212, 17 Cust. B. & Dec. 465 (1983).  Construing

the 1991 drawback entry and the drawback contract (which resulted from an amended proposal

drafted in 1994) according to the 1998 regulatory amendments potentially would be prejudicial to

DuPont's substantive drawback rights and therefore unfair.  The sections in the 1983

promulgation relevant to this case were not changed in substance until the 1998 comprehensive

revision and thus were in effect when DuPont exported the merchandise in 1988-89, when it filed

its drawback entry in 1991, and when it submitted its amended proposed drawback contract

in 1994.

The court recognizes that a drawback contract could come into existence under the 1983

amendments only at the time that Customs approved a drawback proposal, and as a result,

DuPont was not operating under an actual drawback contract at the time of the 1998 regulatory

changes.  *See* 19 C.F.R. § 191.23(a).  *DuPont I*, however, concluded that Customs acted contrary

to law in rejecting the amended proposal that DuPont submitted for approval as a drawback

contract in March 1994.  *DuPont I*, 24 CIT at 1051, 116 F. Supp. 2d at 1350.  In so doing,

*DuPont I* fashioned a remedy that related back to 1994, when the drawback proposal was drafted

and submitted for approval and when the regulations as amended in 1983 were still in effect.  *See*

*id.*  When, in 2000, *DuPont I* ordered Customs to approve the proposed drawback contract,

Customs expressly was directed to approve the proposal as a drawback contract, not as a

drawback "ruling" that would be governed by the 1998 amendments.[17]  *See id.*  The court

_____

[17] The regulations as amended in 1998 discontinued the use of the procedures for
drawback contracts in favor of a new procedure under which Customs now issues drawback
                                                                      (continued...)

concludes that HQ 229433, although correct in its conclusion that DuPont claimed drawback on

the "appearing-in" basis and in so doing limited its potential drawback, erred in resolving the

issue according to the 1998 amendments to the Customs drawback regulations.

3. Customs, in HQ 229433, Mischaracterizes DuPont's Claim as a Claim for Drawback on Waste

In response to DuPont's argument, made in the protest, that the statute does not provide a

basis for apportionment of the duties DuPont paid on the imported merchandise, HQ 229433

concludes that by seeking drawback absent such apportionment DuPont is impermissibly seeking

drawback on its waste.  HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373 at *4.

Defendant reiterates this argument in support of its cross-motion for summary judgment.  Def.'s

Mem. 23 (explaining that "by arguing that it is entitled to drawback on the synthetic rutile as a

whole when it only uses the titanium to manufacture its pigments, DuPont is asking for drawback

on its waste.").  In support of this contention, Customs stated in HQ 229433 that "it has long

been Customs [*sic*] position, based on long-standing Court decisions, that drawback is not

---

[17](...continued)
"rulings." *Drawback*, 63 Fed. Reg. 10,970, 11,009 (Mar. 5, 1998) (setting forth § 191.7 on
general manufacturing drawback rulings); T.D. 98-16, 32 Cust. B. & Dec. 35, 139 (1998) (also
setting forth § 191.7 on general manufacturing drawback rulings); *Drawback*, 63 Fed. Reg.
at 11,010 (setting forth § 191.8 on specific manufacturing drawback rulings); T.D. 98-16, 32
Cust. B. & Dec. at 141 (also setting forth § 191.8 on specific manufacturing drawback rulings).
The drawback ruling procedure established by T.D. 98-16 is analogous to and similar to the
drawback contract procedure of the previous regulations; there are, however, some differences.
For example, specific drawback rulings, in parallel with the general procedures for Customs
rulings set forth in Part 177 of the Customs Regulations, remain in effect indefinitely unless
terminated. *Drawback*, 63 Fed. Reg. at 11,011 (setting forth § 191.8(h)); T.D. 98-16, 32 Cust. B.
& Dec. at 143 (also setting forth § 191.8(h)).  Specific drawback contracts have a fifteen-year
term and may be renewed. *Customs Regulations Revision Relating To Drawback; Specialized
and General Provisions*, 48 Fed. Reg. 46,740, 46,758 (Oct. 14, 1983) (setting forth §§ 191.23(a)
and 191.26); T.D. 83-212, 17 Cust. B. & Dec. 465, 520, 522 (1983) (setting forth §§ 191.23(a)
and 191.26).

allowable on the exportation of waste." HQ 229433 (May 10, 2002), *available at* 2002 WL

1584373 at *4. The ruling cites C.S.D. 80-137, 14 Cust. B. & Dec. 941 (1979), and *United*

*States v. Dean Linseed-Oil Co.*, 87 F. 453, 456 (2d. Cir. 1898), *cert. denied*, 172 U.S. 647

(1898). *Id.* Relying on the Customs position that drawback is not available on the exportation of

waste, the ruling concludes that "DuPont is not entitled to drawback on the waste which results

from its manufacturing process." *Id.*

 Although the court agrees that drawback, on the facts of this case, is not payable on the

waste that resulted from the TiPure production process, the limitation occurs because DuPont's

drawback contract limits claims to the appearing-in basis, not because DuPont attempted to claim

drawback on the exportation of waste. According to the undisputed facts, DuPont exported

TiPure pigment, not waste from synthetic rutile or the other feedstocks. The decisions

HQ 229433 cites in support of its position that drawback is not available on exported waste,

C.S.D. 80-137 and *Dean Linseed Oil*, have no relevance to the issues in this case.

 In C.S.D. 80-137, Customs ruled that manufacturing same-condition drawback is not

available upon the exportation of a "valuable waste byproduct" resulting from the manufacture in

the United States of steel coils from imported steel slabs. 14 Cust. B. & Dec. at 941-42. DuPont

exported the product it manufactured using the feedstocks, not a "valuable waste byproduct"

occasioned by its manufacturing of another product. *Dean Linseed-Oil* involved a claim for

drawback of duties paid on imported linseed that was processed in the United States to yield two

products, linseed oil and oil cake. 87 F. at 454-55. The manufacturing drawback statute in effect

at that time provided for manufacturing direct-identification drawback, as does the current

19 U.S.C. § 1313(a), but did not contain a provision such as that in the current 19 U.S.C.

§ 1313(a) addressing the question of how such drawback is to be apportioned when two or more products result from the manufacturing process. *Id.* at 455; *see* 19 U.S.C. § 1313(a) (stating that "[w]here two or more products result from the manipulation of imported merchandise, the drawback shall be distributed to the several products in accordance with their relative values at the time of separation.").

At issue in *Dean Linseed-Oil* was whether the apportionment between the two products should be calculated according to relative weight or instead according to relative value, consistent with Treasury Department practice. 87 F. at 455. Finding the statute ambiguous on the point and deferring to a long-standing construction of the statute by the Treasury Department, the Court of Appeals for the Second Circuit, reversing the trial court, decided in favor of apportionment by relative value. *Id.* at 456-57. In relying on *Dean Linseed-Oil*, HQ 229433 not only cites a case that is inapposite but also misconstrues language in the opinion. The appellate court rejected the argument made by the United States that no drawback was available "because oil cake is not a manufactured article, but is waste." *Id.* at 456. Because it concluded that the oil cake was a manufactured article and not a waste product, the Court of Appeals for the Federal Circuit did not reach the issue of whether drawback was available on the exportation of waste.

For these reasons, the court finds no merit in the attempt by Customs to characterize DuPont's drawback claim as one for exported waste.

4. HQ 229433 Incorrectly Relies on the Apportionment Provision of 19 U.S.C. § 1313(a)

In response to DuPont's protest argument that apportionment by weight, as opposed to value, is not appropriate where, as here, the titanium in the synthetic rutile is the only valuable material in the synthetic rutile, HQ 229433 quotes 19 U.S.C. § 1313(a) in concluding that

"apportionment of drawback by relative value . . . is available only where, 'two or more products

result' from the manufacture." HQ 229433 (May 10, 2002), *available at* 2002 WL 1584373

at *4 (quoting 19 U.S.C. 1313(a)). Defendant reiterates this argument in support of its cross-

motion for summary judgment. Def.'s Mem. 22-23. The court is unpersuaded by the logic of the

argument, both because the need for apportionment does not arise when the drawback statute (as

opposed to the regulations) is applied to the facts of this case and because 19 U.S.C. § 1313(a), in

providing that apportionment of drawback by relative value must occur when two or more

products result from the manufacturing process, does not logically support a conclusion that

apportionment by relative value necessarily is precluded in all other instances.

### G.  DuPont's Motion for Summary Judgment Must Be Denied Because DuPont Does Not Qualify for $37,510 in Drawback Under the Approved Drawback Contract

Although the statute potentially makes drawback of $37,542 available on Entry No. G82-

0000542-5, DuPont is not necessarily eligible to receive that amount or the amount it now

claims, $37,510. DuPont may be paid only the drawback, up to the statutory maximum, that is

consistent with the applicable regulations and its approved drawback contract. For the reasons

discussed previously, DuPont's drawback must be determined according to the Customs

regulations resulting from the amendments promulgated in 1983 by T.D. 83-212.[18] *See Customs*

*Regulations Revision Relating To Drawback; Specialized and General Provisions*, 48 Fed.

---

[18] As noted previously, the regulatory provisions relevant to determining the amount of drawback due on Entry No. G82-0000542-5 were substantively unchanged from T.D. 83-212 to the promulgation of the 1998 amendments by T.D. 98-16. *Compare Drawback*, 63 Fed. Reg. 10,970 (Mar. 5, 1998) *and* T.D. 98-16, 32 Cust. B. & Dec. 35 (1998) *with Customs Regulations Revision Relating To Drawback; Specialized and General Provisions*, 48 Fed. Reg. 46,740 (Oct. 14, 1983) *and* T.D. 83-212, 17 Cust. B. & Dec. 465 (1983). In the discussion construing the drawback contract and claim, the court's references to the Customs drawback regulations are to the regulations as amended by T.D. 83-212.

Reg. 46,740 (Oct. 14, 1983); T.D. 83-212, 17 Cust. B. & Dec. 465 (1983).  The only drawback

contract available for Entry No. G82-0000542-5 is that ordered to be approved by *DuPont I* on

the proposal amended on or about March 4, 1994.  *See DuPont I*, 24 CIT at 1051, 116 F. Supp.

2d at 1350; *Approved Drawback Contract*.  Therefore, to rule on DuPont's motion for summary

judgment, the court must determine whether DuPont qualifies for drawback of $37,510 under

that drawback contract and the 1983 amendments to the regulations.  *See* 19 C.F.R. § 191.23(d)

("*Payment of drawback*.  After approval of the contract, drawback will be paid on articles

manufactured or produced and exported in accordance with the law, regulations, and contract.");

*id.* § 191.71(d) (providing that drawback will be determined upon liquidation "on the basis of the

complete drawback claim and the drawback contract.").  For the reasons that follow, the court

concludes that drawback of $37,510 is not available.

Under the 1983 regulatory amendments, a manufacturing drawback claim may be made

either on the basis of the quantity of imported, duty-paid merchandise (or, in the case of

substitution drawback, merchandise of the same kind and quality that is substituted for that

merchandise) that is *used in* producing the exported articles, or alternatively, on the basis of the

quantity of such merchandise *appearing in* the exported articles.[19]  *See* 19 C.F.R.

§§ 191.22(a)(1)(ii), 191.32(a)(1)-(2) (1991) (setting forth requirements for direct identification

and substitution drawback, respectively).  DuPont's drawback contract authorizes drawback only

on an "appearing-in" basis.  *See Approved Drawback Contract* & Attach. A.  The regulations

confine an appearing-in claim to the quantity of imported duty-paid merchandise (or, in the case

---

[19] As explained earlier in this Opinion, the current regulations set forth a similar regulatory scheme but provide more detailed instruction than the regulations promulgated in 1983.

of substitution drawback, imported duty-paid merchandise or substituted merchandise) that appears in the exported product. *See* 19 C.F.R. §§ 191.22(a)(1)(ii), 191.32(a)(1)-(2). Appearing-in claims and used-in claims differ with respect to the treatment of waste. If the manufacturer or producer is claiming substitution drawback on the used-in basis, "the records of the manufacturer or producer shall show the quantity and value of both the merchandise used in the manufacture or production of the articles and valuable waste incurred in order that the deduction provided for in § 191.22(a)(2) may be made in liquidation." *Id.* § 191.32(b). According to that deduction, which is set forth in the regulations for direct identification claims (§ 191.22) but also applies, in the same way, to substitution claims, "the quantity of imported duty-paid merchandise or drawback products used will be reduced by an amount equal to the quantity of merchandise the value of the waste would replace." *Id.* § 191.22(a)(2).

According to the uncontested facts, DuPont's manufacturing of TiPure produced wastes that consisted of oxygen and metal chlorides that originated as impurities in the feedstocks and that did not appear in the finished TiPure pigment. *See* Compl. ¶ 7; Norman Shurak Decl.; *Approved Drawback Contract* Attach. A. A small amount of titanium from the feedstocks also may have resulted in waste. *See Approved Drawback Contract* at 3 & Attach. A. DuPont's appearing-in drawback claim is based on the appearance, in the exported TiPure pigment, of 3,713,335 pounds of titanium. The imported synthetic rutile that DuPont used in manufacturing and designated for drawback had a slightly higher titanium content, 3,716,493 pounds; the small difference of 3,158 pounds can be considered to be titanium obtained from designated synthetic rutile or substituted feedstocks that resulted in irrecoverable waste. It is possible that a small amount of titanium was contained within the wastes that DuPont describes, although the

uncontested facts do not reveal exactly what happened to the lost titanium. The drawback

contract states that losses of titanium are negligible and that the metal chloride wastes may

contain trace amounts of titanium. *Approved Drawback Contract* at 3 & Attach. A.

From the uncontested facts, the court can conclude that if, hypothetically, DuPont's

contract had authorized a used-in claim and DuPont were able to show through records that all of

the waste resulting from the manufacturing process was valueless waste, DuPont, upon

compliance with all other regulatory requirements, would qualify for drawback in the maximum

amount allowed by the statute, $37,542. The court so concludes because, on these hypothetical

facts, § 191.32(b) and § 191.22(a)(2) would not result in a reduction in the quantity of imported,

duty-paid merchandise on which drawback is payable. Specifically, the merchandise on which

drawback is payable would consist of the entire quantity of imported, duty-paid synthetic rutile

that is designated for drawback on the drawback entry form, *i.e.*, 6,762,693 pounds of imported

synthetic rutile. For the reasons discussed previously in this Opinion, the maximum drawback

potentially made available by the statute on that amount of designated merchandise is $37,542.

Even had DuPont's drawback contract authorized a used-in claim, DuPont still could not

qualify for drawback in the full amount of $37,542 because it could not establish, on the

uncontested facts, that the waste was valueless. DuPont asserts, in support of its motion for

summary judgment, that the waste may be transferred to third parties and that "[t]he minimal

revenue that DuPont receives from the transfers to third parties does not cover the cost of the

additional processing necessary to make the material suitable for transfer." Norman Shurak

Decl. ¶ 6. Because some of the waste was sold rather than disposed of, because plaintiff admits

that it received revenue for the sale, and because plaintiff, in support of its motion for summary

judgment, has not asserted facts from which the value of the waste could be determined, it could

not be presumed that all of the waste was valueless.  Therefore, it is possible that the deduction

required by 19 C.F.R. § 191.22(a)(2) would reduce the drawback that would be available to

DuPont on a used-in claim to an amount less than the statutory maximum of $37,542; on these

facts, however, the amount of the reduction could not be determined.

In contrast, for an appearing-in claim, the regulations regard as irrelevant to the

calculation of drawback the composition and value of any waste resulting from the

manufacturing of the exported merchandise.  Consistent with the more limited scope of

appearing-in claims, the regulations do not impose on appearing-in claims a general requirement

that records reveal the quantity or the value of the waste resulting from the production process.[20]

Similarly, the regulations do not apply to appearing-in claims the deduction for valuable waste

that is provided for in § 191.22(a)(2).  Because what appears in the exported product is not waste,

it would be illogical for the regulations to account for valuable waste on an appearing-in claim by

reducing the amount of merchandise on which drawback is payable, and the regulations do not do

so.  In comparison, duties paid on a portion of imported duty-paid merchandise that resulted in

waste may be refunded in drawback on a used-in claim, subject to the reduction for valuable

waste, provided the manufacturer or producer maintained the required records, including in

particular the records to show the value of any valuable waste that resulted from the process.  *See*

---

[20] The regulations, in § 191.22, set forth recordkeeping requirements for direct identification claims that also apply to substitution claims, with exceptions for the specific recordkeeping requirements applying to substitution claims under 19 C.F.R. § 191.32.  *See* 19 C.F.R. §§ 191.22, 191.32 (1991).

19 C.F.R. §§ 191.22(a)(2), 191.32(b) (setting forth requirements for direct identification and substitution drawback, respectively).

Relevant to determining the correct amount of drawback on DuPont's appearing-in claim is the fact that what appeared in the exported TiPure was not synthetic rutile. The only portion of the designated synthetic rutile, or of the feedstocks substituted for the designated synthetic rutile, that appeared in the TiPure was titanium, which was present in the TiPure in the form of the compound titanium oxide. The non-titanium content of the synthetic rutile and other feedstocks that were used to produce the exported TiPure (and, apparently, some small portion of the titanium content as well) resulted in waste. Titanium originating in the designated and substituted merchandise, and appearing in the TiPure, was the only portion of the designated or substituted merchandise that was not converted to waste.

DuPont argues that its claiming drawback on an appearing-in basis does not reduce its drawback from the amount it claims because the non-titanium wastes, rather than becoming valueless during manufacturing, never had value. Pl.'s Supplemental Mem. 5-9. In support of its position that $37,510 is the correct amount of drawback on Entry No. G82-0000542-5 even though its claim is an appearing-in claim, DuPont argues that waste that was valueless before the manufacturing process is not the type of waste that can reduce the drawback available on an appearing-in drawback claim. *Id.* at 6. DuPont argues that under the proper construction of the previous version (*i.e.*, the 1983 version) of the regulations, only waste that became valueless during the manufacturing process (such as, in this case, the small amount of titanium lost in processing) reduces the drawback payable, and waste that already was valueless, such as the non-titanium content of the synthetic rutile, does not. *Id.* at 3-6. In effect, DuPont's position is that

only the slight loss of titanium occurring during processing reduces DuPont's drawback under the appearing-in basis from that which would have been available under a used-in basis. *See id.* at 7-9; *Approved Drawback Contract* at 3 & Attach. A. According to this logic, had all the titanium in the designated synthetic rutile appeared in the exported TiPure, DuPont would qualify for drawback of $37,542, and the slight loss of titanium would reduce the drawback payable only slightly, to $37,510.

The court is unable to agree with DuPont's interpretation of the regulations. For manufacturing drawback claims made according to the appearing-in basis, the regulations treat as entirely irrelevant the question of whether or not waste resulting from the process has value. This principle is the same whether the drawback claimed is direct identification or substitution drawback. *See* 19 C.F.R. §§ 191.22(a)(1)(ii) & (a)(2), 191.32(a)(2) & (b) (setting forth requirements for manufacturing direct identification drawback and manufacturing substitution drawback, respectively). The error in DuPont's construction of the regulations does not stem from the process of substitution but arises from the way in which the drawback regulations treat waste, which is common to both direct identification and substitution drawback. Because waste does not appear in the exported product, the regulations exclude from the drawback payable on an appearing-in claim any duties paid on any portion of the imported duty-paid merchandise that resulted in waste, whether the waste was valuable or not. To agree with DuPont's argument, the court not only would have to accept, as a matter of fact, that all of the waste resulting from the production of the exported TiPure was valueless waste but also would have to conclude that a factual determination of the value of the waste is relevant to DuPont's appearing-in claim. The principal shortcoming in DuPont's argument is not DuPont's inability to show that the waste was

entirely valueless (although that would be a problem on the uncontested facts, were DuPont to be pursuing a used-in claim), it is that the court, in deciding the amount of drawback payable on an appearing-in claim under the 1983 version of the drawback regulations, cannot properly attach any significance to the question of whether the waste was valuable or valueless.

Moreover, the court finds nothing in the text of the regulations to support DuPont's interpretation distinguishing between material that became waste as a result of processing and material that was inherently valueless before processing began and remained so after the processing was completed.  The regulations distinguish between waste that has value and waste that does not, but they contain no hint of the distinction drawn by plaintiff.  DuPont would have the court adopt a construction under which some types of waste are deemed, absent any proof based on records, to be valueless in all drawback situations.  Nothing in the regulations so provides.  For claims seeking the full drawback on the portion of the imported duty-paid merchandise that results in waste, the regulations require the manufacturer or producer to keep records on that waste.  *See* 19 C.F.R. §§ 191.22(a)(1)(iv) & (2), 191.32(b) (setting forth requirements for direct identification and substitution drawback, respectively).

Plaintiff has not identified, and the court is unaware of, any rulings or other issuances in which Customs has construed the 1983 drawback regulations in the way plaintiff advocates here. Customs headquarters rulings construing the 1983 regulations, although not involving the precise drawback waste issue presented in this case, contain language addressing generally the treatment of waste in appearing-in claims and used-in claims.  *See* HQ 227559 (Mar. 3, 1998), *available at* 1998 WL 262180; HQ 226184 (May 28, 1996), *available at* 1996 WL 612304.  This general language is consistent with the court's construction of the regulations.  *See* HQ 227559 (Mar. 3,

1998), *available at* 1998 WL 262180 (stating that "if the basis of the drawback claim is the quantity of imported merchandise appearing in the exported articles, the quantity of waste incurred, whether it is valueless or valuable, will reduce the drawback paid."); HQ 226184 (May 28, 1996), *available at* 1996 WL 612304 (stating that "[u]nder the 'appearing in' method, of course, the portion of the imported merchandise resulting in waste would not appear in the exported article and, therefore, the effect would be to reduce the amount of drawback available.").

DuPont also argues that waste that was valuable merchandise when imported must be distinguished from waste that is intrinsically worthless material stripped away from valuable imported merchandise, lest an absurd result be reached in this case. Pl.'s Supplemental Mem. 6-9. Plaintiff views the used-in and appearing-in methods of claiming drawback as "nothing more than accounting structures" that "do not, and could not, have any effect on substantive drawback rights conferred by statute." *Id.* at 3.

The court does not consider it absurd, or contrary to the intent of Congress, that an appearing-in claim based on manufacturing generating significant quantities of waste typically will result in less drawback than will a used-in claim made according to the same facts. Used-in claims differ from appearing-in claims precisely in the treatment of waste. The distinction between the two methods is created by the Customs regulations, not the statute. An appearing-in claim potentially allows the manufacturer or producer to avoid entirely the burden of maintaining records on the waste; no records of waste need be kept for an appearing-in claim unless they are necessary to show the quantity of merchandise appearing in the exported articles (which is not

the situation present in this case).[21]  Absent such records, it is reasonable, if not administratively

necessary, that the regulations do not presume the waste to be valueless and instead

presumptively treat the waste as having value.  Both the used-in basis and the appearing-in basis

were available under the 1983 version of the regulations that were in effect at the time DuPont

drafted and submitted its proposed drawback contract and its proposed amended drawback

contract.[22]  The court disagrees that a construction of those regulations that does not distinguish

between the two types of waste identified by plaintiff will defeat the intent of Congress.

For the reasons discussed, the court declines to adopt the construction of the regulations

advocated by plaintiff in support of its claim for drawback in the amount of $37,510.  The

drawback contract ordered to be approved in *DuPont I* clarifies that the appearing-in basis is to

apply; consistent with the use of that method, the contract recognizes that there will be no

"valuable waste" deduction from the drawback being sought.  *See Approved Drawback Contract*

Attach. A (stating that "[DuPont] will claim drawback on an appearing-in basis, and waste

factors will not impact on the drawback calculations.").  Only titanium from the synthetic rutile

and substituted feedstocks appeared in the exported TiPure.  Titanium constituted approximately

55% by weight of the total weight of the synthetic rutile; the remaining 45% of the synthetic

---

[21] For manufacturing direct identification drawback, the regulations provide that "[i]f claim for waste is waived and the appearing in basis is used, waste records need not be kept unless required to establish the quantity of imported duty-paid merchandise or drawback products appearing in the articles."  19 C.F.R. § 191.22(a)(1)(iv).  *See also* 19 C.F.R. § 191.32(b) (substitution drawback).

[22] The 1983 regulations allow drawback entries to be filed prior to the approval by Customs of a proposed revision to a specific drawback contract.  *See* 19 C.F.R. § 191.23(c) (1991); *Int'l Light Metals*, 194 F.3d at 1359.  However, DuPont did not submit to Customs a proposal to revise its drawback contract to allow claims on a used-in basis.

rutile (and, according to the uncontested facts, a small amount of titanium as well) became waste as a result of the manufacturing process. Plaintiff misconstrues the drawback regulations to deem the waste resulting from the non-titanium content of the synthetic rutile to be valueless and to have no significance for the calculation of drawback on an appearing-in claim. Under those regulations, however, it is irrelevant whether the waste is valuable or valueless and whether or not it consisted of titanium or other substances. *See* 19 C.F.R. §§ 191.22(a)(1)(ii) & (a)(2), 191.32(a)(2) & (b). What is relevant to the determination of payable drawback on this appearing-in claim is that a significant percentage of the quantity of the designated synthetic rutile (consisting largely of the non-titanium content of the feedstocks and a small amount of the titanium), all of which represents waste, may not properly be considered to appear in the exported TiPure. For these reasons, the court must deny DuPont's motion for summary judgment.

H.  Defendant Must Be Awarded Summary Judgment Because DuPont Does Not Qualify for Drawback Exceeding the Amount Already Paid on Entry No. G82-0000542-5

Customs paid DuPont $20,839.63 in drawback on Entry No. G82-0000542-5. The court concludes that DuPont does not qualify for drawback in a higher amount. DuPont designated 6,762,693 pounds of synthetic rutile for drawback and paid duties of $37,920.83 on this merchandise. Because titanium, in the amount of 3,713,335 pounds, is the only portion of the designated merchandise (imported duty-paid synthetic rutile) and the substituted merchandise (synthetic rutile, rutile, ilmenite and titania slag) that appeared in the exported TiPure, the difference between the 6,762,693 pounds of designated synthetic rutile and the 3,713,335 pounds of appearing-in titanium constitutes 3,049,358 pounds of waste for drawback purposes. As

discussed above, under the applicable regulations it is irrelevant to the drawback calculation whether this waste is recoverable or whether it has value; nor does it matter that the waste consisted almost entirely of substances other than titanium. The undisputed facts indicate that the 3,049,358 pounds of waste included 3,158 pounds of irrecoverable titanium; however, for the reasons previously discussed, it also is irrelevant to the drawback calculation whether the waste resulted from titanium or instead resulted from the other substances in the designated and the substituted merchandise. DuPont is not eligible for drawback on any of this waste because the approved drawback contract authorizes drawback to be claimed only on an appearing-in basis. For the reasons discussed previously, drawback is payable on the approximately 55% of the quantity of the synthetic rutile that appeared in the exported TiPure, which is $20,822. Less the 1% drawback fee, the amount of drawback is $20,614.

## III. CONCLUSION

The court concludes that plaintiff is not entitled to drawback on Entry No. G82-0000542-5 exceeding the amount it already was paid. Defendant United States, in cross-moving for summary judgment, seeks dismissal of this action on the ground that the Customs determination of the amount of drawback upon the reliquidation of the entry was correct. The court, therefore, will enter summary judgment in favor of defendant and dismiss this action.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: May 27, 2008
      New York, New York